**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**ST. FRANCIS HOSPITAL OF LYNWOOD, a corporation, Respondent.**

No. 78–1048.

United States Court of Appeals, Ninth Circuit.

July 18, 1979.

---

K. Bruce Stickler and Arthur E. Beck, Wood, Lucksinger & Epstein, Chicago, Ill.,

on brief; Linda J. Dreeben, Atty. Deputy Assoc., Gen. Counsel, NLRB, Washington, D.C., for petitioner.

Jeffrey Berman, Loeb & Loeb, Los Angeles, Cal., for respondent.

Before BARNES, MERRILL and TANG, Circuit Judges.

BARNES, Senior Circuit Judge.

Pursuant to Section 10(e) of the National Labor Relations Act (the "Act"), 29 U.S.C. § 130(e), the National Labor Relations Board (the "Board") seeks enforcement of a bargaining order entered against the St. Francis Hospital of Lynwood (the "Hospital").[1] The Board charged the Hospital with violations of Section 8(a)(1) and (5) of the Act, 29 U.S.C. § 158(a)(1) and (5), for the latter's refusal to bargain with the St. Francis Registered Nurses Association, United Nurses Associations of California (the "Union"), which had been certified by the Board as the exclusive representative of a bargaining unit consisting of purportedly non-supervisory registered nurses. Three issues are raised in this case: (1) whether the Hearing Officer erred in refusing to admit evidence from the Hospital in support of a unit consisting of all professional employees rather than only registered nurses, his decision being subsequently affirmed and adopted by the Regional Director and the Board; (2) whether the Board acted arbitrarily and capriciously in its determination of the appropriate bargaining unit herein or whether its decision was unsupported by substantial evidence in the record taken as a whole; and (3) whether there is substantial evidence to support the Board's determination that the Hospital's Assistant Head Nurses are not supervisors within the meaning of Section 2(11) of the Act, 29 U.S.C. § 152(11).

---

1. The Board's decision below is reported in 232 NLRB No. 6 (1977).

## I. *PROCEEDINGS BELOW*

On June 11, 1976, the Union filed a representation election petition with the Board for a bargaining unit at the Hospital consisting of all registered nurses with certain exceptions.[2] In the representation hearing provided for under Section 9(c)(1) of the Act, 29 U.S.C. § 159(c)(1), the Hospital initially argued that the bargaining unit should include all professional employees rather than only registered nurses and requested that it be permitted to present testimony and evidence in support of that position. The Hearing Officer, *sua sponte*, refused to allow the admission of such evidence citing to two previous Board decisions, *Methodist Hospital of Sacramento, Inc.*, 223 NLRB No. 186 (1976), and *Mercy Hospitals of Sacramento, Inc.*, 217 NLRB No. 131 (1975), enforcement denied on other grounds, 589 F.2d 968 (9th Cir. 1978), *cert. denied,* —— U.S. ——, 99 S.Ct. 1221, 59 L.Ed.2d 458 (1979), which held *inter alia* that registered nurses, if they so desire, are *per se* entitled to be represented in a separate bargaining unit.

The Hospital objected to the Hearing Officer's ruling and sought special permission to appeal the evidentiary ruling directly to the Regional Director as provided under the Board's procedural rules.[3] *See* 29 CFR § 102.65(c). During a short recess in the hearing, the matter was presented to the Director of Region 21, who, in an off-the-record meeting, sustained the Hearing Officer's ruling but permitted the Hospital to make an offer of proof. Such an offer of proof was subsequently made, but the Hospital complained that the offer was necessarily limited and that it did not waive its objection to the ruling.

Two additional arguments were raised by the Hospital at the representation hearing. First, if the unit was to be confined to registered nurses, such nurses employed outside of the general Nursing Services Division should be excluded from the unit.[4] Second, it was contended that Assistant Head Nurses were supervisors within the meaning of Section 2(11) of the Act and therefore should be excluded from the unit. Evidence was freely presented and accepted as to these latter two issues.

On September 22, 1976, the Regional Director held that registered nurses, both within and outside of the Nursing Services Division and including Assistant Head Nurses, comprised an appropriate bargaining unit and ordered an election. He rejected the Hospital's claim that the Hearing Officer had committed prejudicial error in refusing to admit the Hospital's evidence as to the propriety of a single all-professional bargaining unit. The Board denied the Hospital's pre-election request pursuant to Section 3(b) of the Act, 29 U.S.C. § 153(b), for a review of the Regional Director's decision.

On October 21, 1976, the Board conducted an election which the Union won

---

2. The parties stipulated that:

    (a) The Director of Nursing, the Associate Director of Nurses, Assistant Directors of Nurses, Head Nurses, the employee health coordinator, the utilization review coordinator, and the infection control coordinator were "supervisors" as defined in Section 2(11) of the Act;

    (b) Members of the religious order that operated the Hospital would be excluded from the bargaining unit; and

    (c) Nurse permittees (those who had completed their education and were waiting for the results of their exams given by the state licensing board) would be included in the unit.

3. The Union's attorney also requested that the Hearing Officer reconsidered his decision because (1) the Union was well prepared to meet the Hospital's evidence on this issue; and (2) the *Methodist* and *Mercy* decisions on this point had not been passed upon by any court of appeals and reliance upon such precedent alone would increase likelihood of a challenge to the proceedings by the Hospital, during which time the registered nurses would remain unrepresented.

4. There are only about 11 registered nurses employed outside the Nursing Services Division. They do not perform the same general functions as staff registered nurses and appear to be under a different system of supervision. However, in terms of other working conditions, they appear to receive similar treatment, *e.g.* they share a common wage scale and benefits. The Hospital's brief before this court fails to *address this issue. We need not consider it in* resolving this case.

by a vote of 126 to 67. No objection was filed by the Hospital. On November 1, 1976, the Regional Director certified the Union as the exclusive bargaining representative of a unit at the Hospital consisting solely of registered nurses. The Union requested that the Hospital begin bargaining with it and the Hospital refused. The Union filed an unfair labor charge and the General Counsel issued a complaint against the Hospital charging it with violations of Section 8(a)(1) and (a)(5) of the Act for refusing to bargain. At the unfair labor practice hearing, the Hospital admitted its refusal to bargain but defended its recalcitrance on the grounds it asserted at the representation hearing.[5] The General Counsel moved for summary judgment. After the Hospital responded to the motion, the Board granted summary judgment against the Hospital as it found that the Hospital was merely trying to relitigate matters previously considered by the Regional Director below and by the Board in its *Methodist* and *Mercy* decisions. The Board also affirmed the Hearing Officer's refusal to admit the Hospital's evidence as to the propriety of an all-professional bargaining unit.

The Board ordered the Hospital to bargain with the Union and now seeks enforcement of that order by this court.

## II.  FACTS

### A.  *General Background*

The Hospital is an acute-care non-profit medical institution employing some 1440 employees, approximately 220 of whom are registered nurses. The majority of the registered nurses are employed in the Nursing Services Division (the "Division") which is composed of five departments, the five departments being in turn divided into between 17 and 19 specialized units.[6] The Division is headed by the Director of Nursing who is assisted by an Associate Director. There are eight Assistant Directors who are in charge of the five departments. Each of the specialized units is overseen by a registered nurse who is designated as "Head Nurse". It was stipulated by the parties that Head Nurses are supervisors within the meaning of the Act.

### B.  *Assistant Head Nurses*

In between the Head Nurses and the staff registered nurses are the Assistant Head Nurses ("AHN's") of which there are about 60 in number. The work schedule for the Division, and many of the other divisions of the Hospital as well, is divided into three consecutive eight hour shifts. While Head Nurses bear a 24 hour responsibility for each of their specialized units in the Division, they are normally only physically present at the Hospital during the first shift. There is an AHN on duty during each of the three shifts in each unit.

The exact supervisory functions of an AHN are not clearly defined by the testimony and evidence in the record.[7] AHN's,

---

**5.** It is a violation of Section 8(a)(1) and (5) of the Act for an employer to refuse to bargain with a union that has been certified by the Board as the exclusive bargaining representative of a group of its employees. *NLRB v. Newton-New Haven Co.*, 506 F.2d 1035, 1036 (2nd Cir. 1974). However, where, as here, the employer questions the validity of the certification decision or the representation hearing conducted by the Board or its delegate, he cannot get direct judicial review of such issues; but rather he must precipitate an unfair labor practice charge by refusing to bargain with the certified representative and raise the issues as a defense in the subsequent unfair labor practice hearing. *Charlie Rossi Ford, Inc. v. Price*, 564 F.2d 372, 373 (9th Cir. 1977); *accord, Boire v. Greyhound Corp.*, 376 U.S. 473, 476–77, 84 S.Ct. 894, 11 L.Ed.2d 849 (1964).

**6.** The Board's brief states that there are 17 units in the Nursing Services Division, while the Hospital's brief sets the number at 19. The record is not entirely clear on this point.

**7.** Three written job descriptions for AHN's were submitted in evidence. The first was dated "May 1971" and contained the following language:

*JOB SUMMARY —*
An Assistant Head Nurse is a registered professional nurse who, under the direction and guidance of a head nurse, is responsible for the direct and indirect nursing care of patients within an organized unit.
*JOB DUTIES —*
With the head nurse plans, evaluates and administers a plan for the total nursing care of patients. She assumes the function of the

as their name implies, assist the Head Nurses in many of their supervisory functions. An AHN tends to assume more supervisory responsibilities when the Head Nurse is not on duty or is otherwise unavailable. In addition, some Head Nurses appear to delegate more authority to their AHN's than others. Such delegation is sanctioned, even encouraged, by the Hospital. Nevertheless, the majority of the AHN's time is spent performing the same functions as staff registered nurses. Head Nurses are salaried whereas AHN's and staff nurses are paid on an hourly basis. It is unclear from the record whether AHN's receive a higher hourly wage than staff nurses.

The record below contains testimony of instances where: (1) in the absence of Head Nurses, AHN's had conducted interviews of nurse job applicants and made recommendations as to their hiring; (2) a licensed vocational nurse had been terminated following the recommendation of an AHN; and (3) AHN's had issued oral and written warnings to staff employees, placed employees on probation, and recommended transfers. AHN's are given forms wherein they are to evaluate the performances of the staff nurses within their units. The evaluation forms are turned over to the Head Nurse who reviews them and may change them or insert additional comments. Attempts are made by the Hospital to initially resolve grievances informally and, to that end, the AHN's serve as a first resort for the staff nurses. AHN's have initial authority to arrange the daily work and vacation schedules for registered nurses in · their shift in the specialized units. Finally, most of the more important managerial decisions made by AHN's are supposed to be discussed first with the Head Nurse or are to be reported to the Head Nurse who eventually finalizes the decision. However, the record indicates that the recommendations of AHN's are usually followed or, at least, seriously considered by the Hospital's management.

## C. The Hospital's Offer of Proof

In support of its argument for an all-professional bargaining unit, the Hospital's offer of proof focused on (1) the general administration and integration of all professional employees within the Hospital's oper-

head nurse in her absence or may be assigned unit area responsibilities by acting in the capacity of a staff nurse when the head nurse is on duty.

A second job description was dated "6/25/76". (We note that the Union's representation petition was filed on June 11, 1976). The duties of an AHN are listed therein as:

In conjunction with the Head Nurse plans, evaluates and administers a plan for the total nursing care of patients, actively involved in duties related to assignments, leadership, education and evaluation of nursing staff. She assumes the function of the Head Nurse in her absence.

Each Assistant Head Nurse makes out the time schedule for her appropriate shift with the Head Nurse to review upon completion. She may also make time schedule changes within her shift and carry the changes to the nursing office. She assumes the responsibility of staffing her shift so it will remain adequately covered, she will see the guidance of the Head Nurse for concerned areas.

She will assume the responsibility of evaluations for the employees working on her shift. She will forward these on to the Head Nurse for further help, guidance and input.

She may represent the Head Nurse at all meetings, including the department head, which normally are attended by the Head Nurse.

She may represent the Head Nurse at the all day Head Nurse and Assistant Directors Seminars.

She will assume the responsibility of monthly unit inservice. She may delegate some other member of the nursing staff to make the presentation.

She will be exposed to the monthly budget and have a working knowledge of its function.

Assistant Head Nurse could be involved in interviews for potential employees for her shift in the absence of the Head Nurse.

In a document dated "11/11/76" entitled "Nursing Service Task Duties Categories", 95 functions are described and assigned to staff registered nurses. In addition, however, the following three duties are assigned to AHN's and Head Nurses:

96. Makes out personnel schedules for all shifts, maintains adequate coverage for unit care.

97. Evaluates nursing personnel.

98. Evaluates nursing care of patients. Coordinates efforts of the health team in planning patient care.

ations, (2) the lack of foundation to support the Board's decisions in *Methodist* and *Mercy* or in their application to this case, and (3) the similarity of duties and working conditions between registered nurses and other employees. The Hospital employs a variety of professionals in addition to registered nurses: *e.g.* biomedical engineers, social workers, nuclear medicine technologists, physical therapists, dieticians, pharmacists, *etc.*[8]

In said offer of proof, the Hospital's operations are alleged to be highly integrated with physicians, professional employees and non-professional employees in constant contact with each other. The relationship of registered nurses as a group to the other categories of workers in the Hospital purportedly is not unique. Registered nurses receive and follow directions from physicians as do other employees. They exercise independent judgment in their areas of specialization as do other professional employees, although registered nurses tend more to be generalists in the health care field. They routinely work and consult with other professionals. Almost all of the registered nurses share a common background with regard to patient treatment, but then the goal of all of the employees of the Hospital is successful patient care. Moreover, those registered nurses outside the Division, *e. g.* in the radiation therapy, education, utilization review or admitting orders departments, do not share the same supervision as registered nurses and in many of their working conditions are more akin to other professionals, *e. g.* pharmacists. Many of the duties and responsibilities of a staff registered nurse can be performed by other employees, in particular by licensed vocational nurses ("LVN's").

As further alleged in the offer of proof, the management of labor relations at the Hospital is highly centralized. The personnel department controls hiring and interdepartmental transfers, conducts all termination interviews, and administers the employee evaluation program. The personnel department and the Hospital administration play a vital role in the formulation of the job descriptions, hours, shifts, and staffing of the registered nurses. With regard to wages, the Hospital uses a common wage plan which provides for various job classifications each having a wage scale consisting of five steps of five percent each. The wage scales for each classification are annually increased at the same time. All employees, including management and professionals, receive similar benefits. All non-supervisory employees share common working conditions. They use identical personnel and employment forms, maintain time records, are paid on an hourly basis, receive the same overtime premiums and shift differentials, and are subject to the same employment policies, rules of conduct and termination procedures. They also share the same cafeteria and parking facilities. While registered nurses are required to be on duty 24 hours a day, each day of the year by state law, a similar schedule is required by the Hospital for other professional groups, *e. g.* respiratory therapists, radiology technologists, *etc.*, and non-professionals, *e. g.*, LVN's, nurses aides and ward clerks.

The Hospital asserted that in the Los Angeles area only 6 out of 190 acute-care hospitals have registered nurse bargaining units, and 12 out of 265 acute-care hospitals in Southern California. Only six or seven percent of the 166,000 registered nurses in the entire state belong to such units. Many of the exclusively registered nurse bargaining units are the result of voluntary recognition by the employer or are in govern-

---

**8.** The Hospital employs licensed vocation nurses ("LVN's") but did not list them as professionals in its offer of proof. LVN's are described as "professionals" in § 2840.5(a) of the California Business and Professional Code. However, the Board has not treated LVN's as pro-

fessionals but rather as technical employees. *See St. Catherine's Hospital of Dominican Sisters of Kenosha*, 217 NLRB No. 133 at 789 (1975).

Physicians are not treated as employees by the Hospital.

ment hospitals which are exempted from the Act.[9]

### III. *LEGISLATIVE HISTORY OF THE 1974 AMENDMENTS TO THE ACT*

A review of the legislative history of the 1974 amendment of Section 2(2) of the Act, 29 U.S.C. § 152(2), is necessary in order to understand the congressional intent in bringing non-profit hospitals back within the coverage of the Act. Non-profit hospitals were included in the coverage of the original Wagner Act, Act of July 5, 1935, ch. 372, 49 Stat. 449. The Wagner Act was amended in 1947 by the Taft-Hartley Act which excluded from the term "employer" "any corporation or association operating a hospital, if no part of the net earnings inures to the benefit of any private shareholder or individual." 61 Stat. 137 (1947), 29 U.S.C. § 152(2). In response to an increasing amount of labor unrest among employees in the health care industry due in part to lower wages and poor working conditions, Congress reconsidered the exemption of non-profit hospitals from the Act and concluded that there was no acceptable reason why the exemption should be continued. S.Rep.No.93–766, 93rd Cong., 2d Sess. 3 (1974), 2 [1974] U.S.Code Cong. & Admin. News, pp. 3946, 3948; *see also Beth Israel Hospital v. NLRB*, 437 U.S. 483, 497–98, 98 S.Ct. 2463, 57 L.Ed.2d 370 (1978).

In considering legislation to amend the Act, it was immediately recognized that the health care industry was unique and that disruptions caused by organizational drives and related activities at a hospital were a far more serious concern than at an industrial plant given the grave nature of medical care and the fact that "Hospital care is not storable." S.Rep.No.93–766, 93rd Cong., 2d Sess. 39 (1974), 2 [1974] U.S.Code Cong. & Admin.News, pp. 3946, 3953 (individual views of Sen. Dominick). Keeping in mind the paramount public interest in access to uninterrupted health care, a bill was initially offered by Senator Taft which

would have prevented the Board from designating more than the following four bargaining units at a non-profit hospital: professional employees, technical employees, clerical workers, and service and maintenance employees. S. 2292, 93rd Cong., 1st Sess. (1973). However, S. 2292 was not reported out of committee, *see* 120 Cong. Rec. 12941–44 (May 2, 1974). Instead, a compromise was reached between S. 2292 and other proposals in the form of S. 3203, 93rd Cong., 2d Sess. (1974), which was eventually passed by Congress.[10] S. 3203 did not contain any language in regards to bargaining units but the reports of both the Senate and the House of Representatives delineated an identical directive to the Board:

### EFFECT ON EXISTING LAW

### BARGAINING UNITS

Due consideration should be given by the Board to preventing proliferation of bargaining units in the health care industry. In this connection, the Committee notes with approval the recent Board decisions in *Four Seasons Nursing Center*, 208 NLRB No. 50, 85 LRRM 1093 (1974), and *Woodland Park Hospital*, 205 NLRB No. 144, 84 LRRM 1075 (1973), as well as the trend toward broader units enunciated in *Extendicare of West Virginia*, 203 NLRB No. 170, 83 LRRM 1242 (1973)[1]

[1] By our reference to *Extendicare*, we do not necessarily approve all of the holdings of that decision.

S.Conf.Rep.No.93–988, 93rd Cong., 2d Sess. (1974); S.Rep.No.93–766, 93rd Cong., 2d Sess. 5 (1974), reprinted in 2 [1974] Cong. Code & Admin.News, pp. 3946, 3950; H.Rep.No.93–1051, 93rd Cong., 2d Sess. 7 (1974) U.S.Code Cong. Admin.News 1974, p. 3950. As explained by Senator Taft, one of the co-sponsors of the legislation:

I believe this is a sound approach and a constructive compromise, as the Board

---

9. As defined by Section 2(2) of the Act, 29 U.S.C. § 152(2), the term "employer" does not include ". . . the United States or any wholly owned Government corporation . .

or any State or political subdivision thereof . . . ."

10. The corresponding bill in the House was H.R.13678, 93rd Cong., 2 Sess. (1974).

should be permitted some flexibility in unit determination cases. I cannot stress enough, however, the importance of great caution being exercised by the Board in reviewing unit cases in this area. Unwarranted unit fragmentation leading to jurisdictional disputes and work stoppages must be prevented.

The administrative problems from a practical operation viewpoint and labor-relation viewpoint must be considered by the Board on this issue. Health-care institutions must not be permitted to go the route of other industries, particularly the construction trades, in this regard.

In analyzing the issue of bargaining units, the Board should also consider the issue of the cost of medical care. Undue unit proliferation must not be permitted to create wage "leapfrogging" and "whipsawing." The cost of medical care in this country has already skyrocketed, and costs must be maintained at a reasonable level to permit adequate health care for Americans from all economic sectors.

The committee, in recognizing these issues with regard to bargaining unit determination, took a significant step forward in establishing the factor of public interest to be considered by the Board in unit cases.

120 Cong.Rec. 12944–45 (May 2, 1974).

Indeed, on May 7, 1974, just prior to the passage of S. 3203 by the Senate, Senator Taft stated that:

. . . Certainly, every effort should be made to prevent a proliferation of bargaining units in the health care field and this was one of the central issues leading to agreement on this legislation. In this area there is a definite need for the Board to examine the public interest in determining appropriate bargaining units.

120 Cong.Rec. 13559.

Likewise, Congressman Ashbrook, a co-sponsor of the legislation in the House, in discussing the conference report after passage of the legislation in the House noted that the committee was concerned with "the issue of undue proliferation of bar-

gaining units and by language in the committee report has stressed the need for the Board to curtail such proliferation in health care institutions." 120 Cong.Rec. 22949 (1974).

At the time the Senate conference report was considered, Senator Williams made the following remarks:

. . . [T]he National Labor Relations Board has shown good judgment in establishing appropriate units for the purposes of collective bargaining, particularly in wrestling with units in newly covered industries. While the Board has, as a rule, tended to avoid an unnecessary proliferation of collective bargaining units, sometimes circumstances required that there be a number of bargaining units among non-supervisory employees, particularly where there is such a history in the area or a notable disparity of interests between employees in different job classifications.

While the committee clearly intends that the Board give due consideration to its admonition to avoid an undue proliferation of units in the health care industry, it did not within this framework intend to preclude the Board acting in the public interest from exercising its specialized experience and expert knowledge in determining appropriate bargaining units.

120 Cong.Rec. 22575 (July 10, 1974) ("Senator Williams' Remarks").

The Board has recognized its obligation to follow the congressional directive in considering the appropriateness of a bargaining unit in the health care industry. *The Jewish Hospital Association of Cincinnati*, 223 NLRB No. 91 at 616 (1976); *Shriner's Hospital*, 217 NLRB No. 138 at 808 (1975). The circuit courts which have considered the issue have likewise found the legislative history and the congressional directive to be controlling. *NLRB v. West Suburban Hospital*, 570 F.2d 213, 216 (7th Cir. 1978); *St. Vincent's Hospital v. NLRB*, 567 F.2d 588, 592 (3rd Cir. 1977); *Long Island College Hospital v. NLRB*, 566 F.2d 833, 840–41 (2nd Cir. 1977), *cert. denied*, 435 U.S. 996, 98

S.Ct. 1647, 56 L.Ed.2d 84 (1978); *Memorial Hospital of Roxborough v. NLRB*, 545 F.2d 351, 361 (3rd Cir. 1976).

### IV. THE BOARD'S METHODIST AND MERCY DECISIONS

In *Mercy Hospitals of Sacramento, Inc.*, 217 NLRB No. 131 (1975), although the Regional Director had initially divided the hospital's employees into three units (professionals, clerical, and service and maintenance), the Board overruled his decision and found five general bargaining units to be appropriate for all non-profit hospitals: (1) registered nurses, (2) professional employees other than registered nurses, (3) clerical employees, (4) service and maintenance employees, and (5) supplemental employees. Specifically as to registered nurses, the Board held that: "registered nurses, if they are so sought and they so desire, are entitled to be represented for purposes of collective bargaining in a separate bargaining unit." 217 NLRB at 767. Two principal reasons were given to justify that holding. First and most emphasized was a "singular history of separate representation and collective bargaining often as the result of voluntary recognition". However, the Board failed to describe that "singular history" other than merely to refer to unnamed "numerous collective-bargaining agreements" and to some of the Board's pre-1974 Amendment decisions. The other reason was an asserted "community of interests" among registered nurses which was purportedly unique. That factor consisted primarily of various requirements often found in state and administrative regulations to the effect that: registered nurses must be on duty 24 hours a day, each day of the year; that each hospital must have a nursing department which is separately administered; that the control of working conditions, hiring and firing of registered nurses is supposed to be centralized with the director of the nursing department; that their duties cannot be delegated to other employees; and that they must pass uniform licensing examinations. 217 NLRB at 767–68.

Member Kennedy of the Board dissented to the Board's decision in *Mercy* insofar as it created a separate unit for registered nurses rather than keeping the all-professional unit which the Regional Director had found appropriate. He stated that the majority's finding of centralized control over the registered nurses by the department of nursing was not supported by the record. Moreover, he found the alleged "singular history of separate bargaining" by registered nurses not only unimpressive but tainted by "sex considerations". After examining the record, he concluded that registered nurses do not have a sufficiently distinct community of interests apart from other professional employees to warrant a separate unit. 217 NLRB at 774.

The decision in *Mercy* did not state that its five groupings for hospital units were to be an established policy. However, in *Methodist Hospital of Sacramento, Inc.*, 223 NLRB No. 186 (1976), the Board relying solely upon the *Mercy* decision, found a unit consisting of all professional employees, excluding registered nurses, to be presumptively appropriate. In so deciding the Board noted the *Mercy* decision had established that registered nurses were *entitled* to be represented in their own unit. *See* also *Allegheny General Hospital*, 239 NLRB No. 104 (1978).

### V. DISCUSSION

#### A. Exclusion Of Evidence As To The Propriety Of An All-Professional Bargaining Unit

Several related issues are raised by the refusal of the Hearing Officer, as affirmed by the Regional Director and the Board, to accept the Hospital's evidence as to the appropriateness of an all-professional bargaining unit.

#### 1. The Validity of the Board's Per Se Policy

If relevant evidence is excluded on the basis that it unduly repeats evidence submitted at a different hearing, the grounds for the exclusion is substantive rather than evidentiary. *Cf., Catholic Med. Ctr. of Brooklyn & Queens v. NLRB*, 589 F.2d 1166, 1170 (2nd Cir. 1978). The es-

sence of such a ruling is that even accepting the proffered evidence as true, the underlying legal contention which it supports has already been decided adversely to the submitter and cannot, or will not, be overturned. Consequently, in considering the issue of the exclusion of the Hospital's evidence, this court must first determine the validity of the *per se* policy established in the Board's *Methodist* and *Mercy* decisions as the Board here held that the Hospital's proffered evidence merely sought to relitigate matters already decided in those cases and, hence, the refusal to admit the evidence did not prejudice the Hospital.

[4] The Hospital initially argues that the holding of the *Mercy* decision, because it is to be generally applied, was tantamount to a rule. The Hospital further contends that, because of the Board's failure to follow the procedures for agency rulemaking, as delineated in 5 U.S.C. § 553, the rule is unenforceable. Contrary to the Hospital's argument, it has been consistently held that "the Board is not precluded from announcing new principles in an adjudicative proceeding and . . . the choice between rulemaking and adjudication lies in the first instance within the Board's discretion." *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294, 94 S.Ct. 1757, 1771, 40 L.Ed.2d 134 (1974); *NLRB v. Children's Baptist Home*, 576 F.2d 256, 260 (9th Cir. 1978). Thus, the mere fact that the Board created a binding policy by adjudication does not effect the policy's validity especially where it covers an area in which the Board is permitted to act pursuant to its discretion. *See* Section 9(b) of the Act, 29 U.S.C. § 159(b).

■ The key question raised herein is whether the *per se* policy established in the Board's *Mercy* decision (that a bargaining unit of registered nurses is irrebuttably appropriate when sought in a non-profit hospital) is consistent with the congressional directive that the Board give "due consideration" to preventing undue proliferation of bargaining units in the health care industry and Congress's expressed approval of the trend towards broader units in this area. We conclude it clearly is not.

From the legislative history of the 1974 Amendments to the Act, it is apparent that Congress sought to encourage the Board to find broader bargaining units in the health care industry rather than narrower ones. The *Methodist-Mercy* precedent contravenes that congressional admonition by establishing an irrebuttable presumption in favor of certain units. While Congress did not pass S. 2292 which would have set up a uniform four unit limit for all non-profit hospitals, that failure does not sanction the Board's establishment of its own more extensive five unit standard, especially in the fact of contrary language from Congress.[11]

Moreover, the *per se* policy as applied by the Board herein prevented the Hospital from presenting any evidence to demonstrate that the circumstances in its case differed from those in the *Mercy* decision, which differences might justify an all-professional unit. By setting up a policy which is automatically applied and irrebuttable without any examination of the particular situation involved, the Board fails to give "due consideration" to the congressional directive in that case.

Further, one may question the fairness of a policy that is applied without a chance for an effected party to demonstrate that its situation does not fall within the scope of

11. In addition to the five stated bargaining units established by the Board in *Mercy*, the Board has also indicated that it will, at times, permit bargaining units composed of other employee groups as well. *See e.g., Ohio Valley Hospital Association*, 230 NLRB No. 84, at 605 (1977) ("physicians constitute a class unto themselves"); *Mercy Center for Health Care Services*, 227 NLRB No. 265 (1977) (stationary boiler engineers comprised an appropriate separate unit); *Trinity Memorial Hospital of Cud-*

*ahy, Inc.*, 230 NLRB No. 119 (1977) (maintenance department employees held to be entitled to their own unit as opposed to a combined unit of service and maintenance employees as stated in *Mercy, supra*, 217 NLRB at 769). Some more separate units may result from other provisions of the Act. *See e.g.,* Section 9(b)(3), 29 U.S.C. § 159(b)(3) (special provisions for unit consisting of employees who are guards).

the policy or otherwise to argue why the policy should not be applied in its case. This is especially so herein because the Board has not always adhered to its *Mercy* decision but has, on more than one occasion, placed registered nurses in the same bargaining unit as other health care professionals, as the Hospital argued it should do in this case. *See e.g., Family Doctor Medical Group*, 226 NLRB No. 22 at 118 (1976).

The Board attempts to justify its complete reliance upon the *Methodist* and *Mercy* decisions by citing to Senator Williams' Remarks made after the passage of S. 3202.[12] The Board focuses upon the following language of Senator Williams:

> . . . sometimes circumstances require that there be a number of bargaining units among nonsupervisory employees, particularly where there is such a history in the area or a notable disparity of interests between employees in different job classifications.

. . . [Congress] did not within this framework intend to preclude the Board acting in the public interest from exercising its specialized experience and expert knowledge in determining appropriate bargaining units. . . .

120 Cong.Rec. 22575 (1974). Apparently, the Board believes that that isolated statement justifies its refusal to give due consideration to each particular hospital situation in favor of a *per se* policy which, upon the basis of evidence submitted in only one case (*Mercy*)[13], generalizes the working conditions of all registered nurses and their history of collective bargaining in every nonprofit hospital throughout this country.

The Board's interpretation of Senator Williams' remarks places them in conflict with the rest of the legislative history of the 1974 Amendments to the Act on this issue. A more reasonable interpretation is available. Those Remarks merely point out two considerations which the Board can consider in determining that a particular

**12.** It is noted that Senator Williams' Remarks were made after the passage of the bill by both the Senate and the House but prior to the adoption by either of the conference report on the bill. *Amicus* (American Hospital Association) argues that those comments are "post-passage" which "cannot serve to change the legislative intent of Congress expressed before the Act's passage. . . . Such statements 'represent only the personal views of these legislators, since the statements were [made] after passage of the Act.' " *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 132, 95 S.Ct. 335, 353, 42 L.Ed.2d 320. That position on the Remarks has been adopted by some courts and commentators. *E.g., St. Vincent's Hospital v. NLRB*, 567 F.2d 588, 591 n. 3 (3rd Cir. 1977); Vernon, Labor Relations in the Health Care Field under the 1974 Amendments to the National Labor Relations Act: An Analysis, 70 NW.L.Rev. 202, 208 n. 43 (1975); Emanuel, *Problems*, at 202–203; *but see* Note, 1977–1978 Annual Survey of Labor Relations and Employment Discrimination Law, XX B.C.L.Rev. 61, 96 n. 19 (1978). However, prior to the adoption of the conference report, efforts were still being made to amend sections of the bill although those efforts admittedly focused on different areas of the legislation. *See* 120 Cong.Rec. 22941–22946 (1974). The issue therefore arises as to the weight to be given the Remarks.

The language of the committee reports would have more weight than the Remarks if there were any dispute between the two. *International T. & T. Corp. v. General T. & E. Corp.*,

518 F.2d 913, 921 (9th Cir. 1975); *accord, United States v. Auto Workers*, 352 U.S. 567, 585, 77 S.Ct. 529, 1 L.Ed.2d 563 (1957). Also, we would look to the language of the sponsors of the bill as being more demonstrative of the congressional intent rather than the other comments made on the Senate floor. *Cf., National Woodwork Mfgs. Assn. v. NLRB*, 386 U.S. 612, 640, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967). *See* in this regard the statements of Senator Taft and Congressman Ashbrook cited on pages 411 and 412, *supra*. We need not address the issue, however, as our interpretation of the Remarks finds them to be entirely consistent with our reading of the legislative history of the 1974 Amendments to the Act. As discussed below, we do not interpret the Remarks as in any way diminishing the congressional directive that undue proliferation should be prevented where possible in the health care industry.

**13.** While the Board cites to both its *Methodist* and *Mercy* decisions, we initially note that the *Methodist* decision, 223 NLRB No. 186 (1976), is entirely devoid of any articulated reason for a *per se* policy as to registered nurses. In that case, the Board relied solely on its *Mercy* decision, 217 NLRB No. 131 (1975), to support the holding that, even without requesting separation from a unit composed of all professional hospital employees, registered nurses are not to be placed within such a unit.

bargaining unit is appropriate. A requirement of both Senator Williams' Remarks and the legislative history of the 1974 Amendments remains that "the Board give due consideration to . . . [Congress's] admonition to avoid an undue proliferation of units in the health care industry. . . ." Senator Williams' Remarks, 120 Cong.Rec. 22575 (1974). That "due consideration" demands individual examination by the Board, or its delegate, of the circumstances of each particular case in order to determine the propriety of the proposed unit in light of the congressional directive and the public interest. It is in that manner that the Board exercises "its specialized experience and expert knowledge."

A number of other courts have refused to enforce Board orders concerning hospital unit determinations where the Board failed to make an independent weighing of the factors in the situation but merely relied upon presumptive factors. In *Long Island College Hospital v. NLRB*, 566 F.2d 833, 844–45 (2nd Cir. 1977), *cert. denied*, 435 U.S. 996, 98 S.Ct. 1647, 56 L.Ed.2d 84 (1978), and *Memorial Hospital of Roxborough v. NLRB* 545 F.2d 351, 361 (3rd Cir. 1976), the circuit courts found the Board's extension of comity to findings made by state labor boards of the appropriateness of hospital bargaining units to be invalid where the Board did not make its own independent consideration of the circumstances involved in light of the congressional directive. Similarly, the Seventh Circuit in *NLRB v. West Suburban Hospital*, 570 F.2d 213, 216 (7th Cir. 1978), has held that the Board had erred when the facts in the record suggested that a broader unit was appropriate and the Board, in deciding upon a narrower unit, failed to give any indication of the manner in which its narrower unit determination implemented the congressional admonition.

■ This is not to say that a determination of a bargaining unit composed exclusively of registered nurses can never be

valid. Rather, the problem lies in a rule that such a unit is always valid and its concomitant procedural quirk which excludes any consideration of evidence to the contrary. What is necessary is a demonstration, not a mere presumption, of a disparity of interests between registered nurses and other hospital employees. Indeed, there would be no problem if the Board found a bargaining unit of registered nurses appropriate in every instance where such a unit was sought so long as it is clear in each case that a proper determination was actually made. Likewise, certain presumptions may be employed by the Board so long as interested parties are given the opportunity to effectively present evidence to rebut the presumptions.[14]

### 2. *Prejudice to the Hospital*

The Board contends that despite the application of its policy in this case, the Hospital has failed to be prejudiced as it was permitted to make an offer of proof in favor of an all-professional unit. The Board cites to this court's opinion in *NLRB v. Seine & Line Fisherman's Union*, 374 F.2d 974, 981 (9th Cir.), *cert. denied*, 389 U.S. 913, 88 S.Ct. 239, 19 L.Ed.2d 261 (1967), for the proposition that a party claiming injury from procedural irregularities must show that prejudice resulted before being accorded relief.

■ In *Seine & Line* the errors were made in the context of prehearing discovery and held to be minor. In this case, there was a refusal to accept any direct evidence on one of the essential issues of the hearing, *i. e.*, the propriety of the proposed unit determination. Such an error is clearly prejudicial if the interested party is prevented from presenting any evidence on the subject or, as in this case, its offer of proof contains any well-pleaded allegation which suggests that the Board's unit determination is improper. Because we find the Hos-

---

**14.** In order for the Board to utilize a presumption in this context, it must, at some prior occasion, articulate the bases for that presumption in a manner in which a court may review its propriety. As discussed below, a problem in this case is that the Board relies on the presumption established in its *Mercy* decision, and the *Mercy* opinion is woefully inadequate as to the facts which support the Board's reliance.

pital's proffered evidence as to the appropriateness of an all-professional unit to be definitely relevant and because we do not believe that the Board's *Mercy* decision can or should control this case, we find the refusal to receive the Hospital's evidence herein to be arbitrary and capricious. As noted by the Supreme Court in *Labor Board v. I. & M. Electric Co.,* 318 U.S. 9, 28, 63 S.Ct. 394, 405, 87 L.Ed. 579 (1943):

The Act accords a great degree of finality to the Board's findings of fact, and this Court has been insistent that the admonition of the Act be strictly observed. But courts which are required upon a limited review to lend their enforcement powers to the Board's orders are granted some discretion to see that the hearings out of which the conclusive findings emanate do not shut off a party's right to produce evidence or conduct cross-examination material to the issue. The statute demands respect for the judgment of the Board as to what the evidence proves. But the court is given discretion to see that before a party's rights are finally foreclosed his case has been fairly heard. Findings cannot be said to have been fairly reached unless material evidence which might impeach, as well as that which will support, its findings, is heard and weighed.

3. *The Board's Application of the Mercy Decision Herein*

Given our finding of error in the handling of the Section 9(c) hearing upon which the Board's order rests, we need not proceed further. However, the Board argues that the Hospital's offer of proof was insufficient and, from the record, claims it clearly acted within its discretion in its unit determination. Again we must disagree.

■ In considering whether the record contains substantial evidence which supports the Board's determination herein, we accept the statements in the Hospital's offer of proof as true unless specifically con-

tradicted by evidence in the record. As recently stated in *Prestolite Wire Division v. NLRB,* 592 F.2d 302, 306–07 (1979):

Where, over objection, the Board's certification is made without the benefit either of a hearing or of the full record compiled by and relied upon by the investigative officer, we believe we are justified in taking that record as we find it, and in construing the well-pleaded factual assertions in . . . [the employer's] objections most favorably to it.

A similar rule should be applied here where the Hospital was not permitted to introduce relevant evidence but merely allowed to make an offer of proof.

a. *The "Singular" History of Collective Bargaining*

In its offer of proof the Hospital attempted to show the factors which distinguished its situation from those in the *Mercy* case and to demonstrate that certain of the factual conclusions reached in *Mercy* were simply wrong and therefore inapplicable.

■ As to registered nurses' purported "singular history of separate representation" which the Board in *Mercy* found to be "perhaps of the greatest significance", the Hospital offered to show that registered nurses did not have any impressive prior history of collective bargaining either in the entire country, in the Sacramento area where the Mercy Hospital was located, or in Southern California where the respondent Hospital is located. The *Mercy* decision itself fails to delineate any specific evidence or data as to that history. One commentator has noted the absence of supporting evidence or data in the transcript and record in the *Mercy* case.[15] *See* Emanuel, Hospital Bargaining Unit Decisions ("Emanuel"), contained in *Labor Relation Law, Problems in Hospitals and the Health Care Industry* ("*Problems*"), Knapp ed., 187 at 193 (1977).

---

15. In oral argument before this court, the Board claimed that supportive statistics were presented in the legislative history of the 1974 Amendments to the Act. Our review of the legislative history failed to locate such statistics.

Specifically, the Hospital asserted that in the Sacramento area there was only one non-governmental hospital which had a registered nurse bargaining unit. In the Southern California area, out of approximately 265 acute care hospitals, there were only 12 such bargaining units (4.5%). In Los Angeles County there were purportedly only 6 such units and 190 acute care hospitals (3.2%). In California as a whole, 86 of the 637 acute-care hospitals (13.5%) had such units but the majority of those hospitals are in the San Francisco Bay area. Out of the 166,000 registered nurses in the state, 11,000 (6.7%) belong to separate units although 2,200 of those were employed in government hospitals. In the nation, there are no registered nurse bargaining units in 22 states. 4 states have only one such unit. 24 states have 2 or more and, of those states, 8 have more than 10 units. Finally, the Hospital offered evidence that there were bargaining units in the state that contained both registered nurses and other professionals and/or non-professionals.

Given the above statistics, we fail to see why the Board in *Mercy* found such a history to be either "singular" or impressive. The Board in its brief to this court now argues that what these statistics show is that where registered nurses have sought to bargain, they have sought to do so in units limited to their own profession. While that argument would normally be quite persuasive given that the desires of employees are generally relevant to the determination of the appropriate bargaining unit, *Teamsters, Chauffeurs, Help. & Del. R., Local 690 v. NLRB*, 375 F.2d 966, 976 (9th Cir. 1967). we still have problems with the Board's contention. First, the argument the Board now proffers here is not the one it gave in *Mercy* to justify its holding there. In *Mercy*, it was an alleged "tradition of separate and exclusive bargaining" as demonstrated in prior Board determinations and by "numerous collective bargaining agreements which have been negotiated in behalf of registered nurses" which the Board found convincing, not some consistently expressed desire which allegedly manifests itself when registered nurses seek to be represented.

Second, the statistics that are given are too raw to be particularly conclusive of a general sentiment among registered nurses as a whole. This is especially so if one considers the Board's admission that it has "routinely established separate nurse units for collective-bargaining purposes". *Mercy, supra,* 217 NLRB at 767. Finally, despite the purported desires of registered nurses, the congressional directive against undue proliferation must also be considered. The Board would be in violation of the directive if it granted separate units to each health care employee group which wanted it simply because said group views itself as separate from other classifications of employees for purposes of representation. When admonishing the Board to prevent proliferation, Congress realized that some employee groups would not get their wish for separate representation but would have to be satisfied with collective representation with other employee groups.

b. *Community of Interests*

■ Initially we have a problem in fully appreciating the Board's second rationale in *Mercy* that because registered nurses have a "community of interests" they are entitled to a separate unit. While the community of interest standard may be decisive in other industries, it is not entirely controlling for the health care industry in the present context. As noted in *St. Vincent's Hospital v. NLRB*, 567 F.2d 588, 592 (3rd Cir. 1977), "The Board therefore should recognize that the contours of a bargaining unit in other industries do not follow the blueprint Congress desired in a hospital." As further stated in *NLRB v. West Suburban Hospital*, 570 F.2d 213, 215 (7th Cir. 1978), "Congress has made it clear that the Board must view evidence of traditional factors in the context of the stated Congressional policy of preventing proliferation of bargaining units in the health care field." Cf., *Shriner's Hospital for Crippled Children*, 217 NLRB No. 138 at 808 (1975).

■ The Board here and in *Mercy* cites to Senator Williams' Remarks to justify its reliance on a community of interests stan-

dard. *Mercy, supra,* 217 NLRB at 766–67. However, Senator Williams did not state that an examination of community of interests should be made or that it could justify a determination that a separate unit was appropriate. Rather, his statement was that "a notable *disparity of interests* between employees in different job classifications [emphasis added]" could sometimes require a number of bargaining units. We view that language and the remaining legislative history of the 1974 Amendments to the Act as requiring the Board to determine not the similarities among employees in the same job classification (indeed the fact that they share the same classification would inevitably lead to the discovery of many similarities), but instead the "disparity of interests" among employee classifications which would prevent a combination of groups of employees into a single broader unit thereby minimizing unit proliferation. The congressional approval of the trend toward broader units in the health care industry indicates an awareness that the traditional factor of community of interests would be subordinated to the directive against undue proliferation. However, by including non-profit hospitals within the Act, Congress sought to extend to hospital employees effective labor rights. By focusing upon the disparity of interests between employee groups which would prohibit or inhibit fair representation of employee interests, a balance can be made between the congressional directive and the employees' right to representation.

Again we emphasize that we do not reach any conclusion that registered nurses could never exhibit a disparity of interests which would separate them from all other employee groups.

Even if a "community of interests" standard was controlling, the Board's showing, which relied primarily upon certain findings in the *Mercy* case, is simply insufficient. First, as to the fact that the Hospital was required to have registered nurses on duty every hour of every day, the Hospi-

tal claims that it requires other groups of employees to maintain the same schedule. Moreover, the exact import of that requirement to the unit determination is unclear. Second, as to the argument that a registered nurse's duties cannot be delegated to other employees, we note that both in fact and under relevant state law other classifications of employees have duties which cannot be delegated. *E. g.* pharmacists, § 4385 California Business and Professions Code ("Cal.B. & P.Code"); clinical laboratory technicians, §§ 1269–70 Cal.B. & P.Code. While we find that, in fact, many of the registered nurses' duties at the Hospital could be and are performed by other employees, the Hospital's claim that all of the duties of a registered nurse could be performed by a LVN is not substantiated by a review of the relevant code provisions. *Compare,* Chapter 6 of Division 2 of the Cal.B. & P.Code delineating the functions of registered nurses with Chapter 6.5 of the same Division for LVN's. Still, according to one U.S. Department of Labor study, there are about 238 separate job classifications in use in the health care industry.[16] Many of those job classifications entail duties which cannot be delegated to other employees. Clearly, unit proliferation would result if non-assignability of duties were a key factor in hospital unit determinations. Third, the requirement of a separate department for nursing is not as uncommon as the Board in *Mercy* seems to suggest. The Joint Commission on Accreditation for Hospitals, Accreditation Manual (rev. ed. 1970) which is referred to by the Board also requires hospitals to maintain other separately administered departments in addition to a nursing division. Fourth, the complete authority over registered nurses which allegedly is centralized in the director of nursing was disputed by the Hospital. However, we note that the Hospital's offer of proof on this issue was contradicted in many instances by the evidence which it submitted on the issue of whether AHN's were supervisors. Fifth, the license

---

**16.** *See* United States Dep't of Labor, Job Descriptions and Organization Analysis for Hospitals and related Health Services (rev. ed. 1970), as cited in Emanuel, *Problems* at 188.

and educational requirements do not make registered nurses unique as a wide number of hospital employees must meet a minimum education criterion before being eligible for a license to practice. *E.g.,* pharmacists, § 4085 Cal.B. & P.Code; LVN's under § 2866 Cal.B. & P.Code. Finally, many of the so-called community of interest elements cited by the Board in *Mercy* were imposed by state law or some other regulatory body. The fact that a state may choose to regulate a particular occupation should not be controlling in the determination of an appropriate bargaining unit. "[O]therwise, the development of a uniform national labor policy would be frustrated by undue reliance on the vagaries of state law." *St. Vincent's Hospital v. NLRB,* 567 F.2d 588, 592 (3rd Cir. 1977).

**B.** *The Appropriate Bargaining Unit*

As discussed in section VA of this opinion, we find the unit determination herein to be arbitrary and capricious because it is based upon findings from a hearing in which relevant evidence as to that issue was unjustifiably precluded. We need not and moreover cannot decide the issue of the propriety of the bargaining unit at the Hospital composed entirely of non-supervisory registered nurses given the deficient record before this court on the issue. "Our function is not to determine the bargaining unit, merely to make plain what we see as the Board's error." *NLRB v. Mercy Hospitals of Sacramento, Inc.,* 589 F.2d 968, 973 (9th Cir. 1978), *cert. denied,* —— U.S. ——, 99 S.Ct. 1221, 59 L.Ed.2d 458 (1979); *accord, South Prairie Const. v. Operating Engineers,* 425 U.S. 800, 805–06, 96 S.Ct. 1842, 48 L.Ed.2d 382 (1976).

**C.** *Supervisory Status Of Assistant Head Nurses*

■ Given the above expressed views, it is not necessary to discuss the Hospital's

remaining contention that the Board erred in including AHN's in the bargaining unit as the Board's order is unenforceable in any event. However, in light of the extensive testimony on this issue below, we will consider it in order to save time and expense in future proceedings in this case.

A full and unrestricted hearing was presented as to the supervisory status of AHN's. Unlike its bargaining unit determination herein, the Board's decision on the supervisor issue did not on its face conflict with any congressional directive in the 1974 Amendments to the Act.[17] As noted by this court in *NLRB v. Doctors' Hospital of Modesto, Inc.,* 489 F.2d 772, 776 (9th Cir. 1973):

> Where, as here, the specific issue involves the application of a broad statutory term ("supervisor") and the Board has the authority and duty to make the interpretation in the first instance, its "determination . . . is to be accepted if it has 'warrant in the record' and a reasonable basis in law." *N.L.R.B. v. Hearst Publications, Inc.,* 322 U.S. 111, 131, 64 S.Ct. 851, 861, 88 L.Ed. 1170 (1944).

Section 2(11) of the Act defines "supervisor" as:

> . . . any individual having [the] authority, in the interest of the employer, to hire, transfer, suspend, layoff, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

The list of supervisory functions in Section 2(11) is to be read in the disjunctive with the existence of any one of the powers, regardless of the frequency of its exercise, being sufficient to confer supervisory status upon the employee. *NLRB v. Pilot Freight*

---

**17.** Congress in enacting the 1974 Amendments to the Act cautioned the board not to apply the definition of supervisor to a "health care professional who gives direction[s] to other employees in the exercise of his professional judgment, [if those directions are] incidental to the professional's treatment of patients." S.Rep. No.93–766, 93rd Cong., 2d Sess. 6 (1974); H.Rep.No.93–1051, 93rd Cong., 2d Sess. 7 (1974); reprinted in 2 [1974] U.S.Code Cong. & Admin.News, pp. 3946, 3951.

*Carriers, Inc.,* 558 F.2d 205, 207 (4th Cir. 1977), *cert. denied,* 434 U.S. 1011, 98 S.Ct. 723, 54 L.Ed.2d 754 (1978).

The problem with the Hospital's argument that AHN's are supervisors is its failure to present sufficient evidence of a consistent and established Hospital policy empowering AHN's to act as supervisors. While the Hospital offered testimony of Head Nurses who explained that they delegated many managerial functions to AHN's, not all of the Head Nurses delegated such a high degree of authority to the AHN's who worked under them. Moreover, the record contains evidence that the Hospital did not have any set program which gave AHN's instruction or guidance to make them aware of their purported supervisory powers or how to properly apply them in the interests of management. There was some evidence that the Hospital was attempting to rectify this failure in administration, but it is unclear how far it progressed if at all.[18]

Another major problem for the Hospital is its rather contradictory statements in its offer of proof. As stated by the Hospital's counsel to the hearing officer:

> As I mentioned, the labor relations management at the Employer's hospital is highly-integrated, and their employees share a community of interest with respect to wages, benefits and working conditions.

> Moreover, the personnel department and the hospital's administration as a whole play a vital role in the formulation of the job descriptions, hours, shifts, and staffing of the registered nurses.

> Registered nurses are also subject to the same hiring and termination procedures as other employees.

Those assertions by the Hospital raise sufficient doubts as to the accuracy and integrity of the Hospital's later claims that AHN's have authority over hiring, firing, work shifts and staffing of registered nurses.

Finally, insofar as AHN's participate in such supervisory functions as hiring, firing, scheduling, discipline and adjusting grievances, their contributions appear to be either merely in the capacity of reporting to management rather than any independent exercise of authority, or as a result of a temporary delegation of authority from Head Nurses. As to hiring and firing, the few examples of such activity by an AHN in the record suggest that AHN's are not normally involved in the process. Indeed, in the instances cited by the Hospital, it was an absence of a Head Nurse that caused the AHN to be called upon or prompted her to act on her own. Likewise, the initial assigning of nurses to particular units and shifts seems to be made by the nursing office or the Head Nurses. Thereafter, an AHN in charge of the unit shift coordinates work and vacation schedules, meals off, rest periods, and locating replacements when the need arises. Such activity is more clerical than supervisory. As to the AHN's alleged authority to discipline, evaluate and adjust grievances, the extent of their powers in these areas was not made clear in the record as the Head Nurses were inevitably involved in those processes as well.

Two cases support the Board's position on this limited issue. In *NLRB v. Doctor's Hospital of Modesto, Inc.,* 489 F.2d 772 (9th Cir. 1973), this court held that certain nurses were not supervisors despite the employer's contention that they could assign and direct auxiliary personnel and that they periodically relieved nurses who were found to be supervisors. In *Westinghouse Electric Corp. v. NLRB,* 424 F.2d 1151 (7th Cir.), *cert. denied,* 400 U.S. 831, 91 S.Ct. 63, 27 L.Ed.2d 62 (1970), it was held that an engineer who was selected as "lead engineer" for a particular project was not a supervisor, even though he had overall responsibility for planning, scheduling and successfully completing that project, because his degree

---

**18.** In comparing the "May 1971" written job description for AHN's with the "6/25/76" description, it would appear that the Hospital was attempting to assign more managerial type functions to AHN's. However, the latter description still placed AHN's in a position which is subordinate to the Head Nurses and lacks sufficient indication of any significant or substantial independent and individual authority.

of authority over other engineers did not make him their supervisor. It was also held that "phase engineers" were not supervisors even though the record showed that:

> . . . a phase engineer has recommended, for final decision by the lead engineer, increasing or reducing the number of craftsmen working on his phase; that a phase engineer would report incompetency of a craftsman to the lead engineer and the latter would accept his word; that the phase engineer recommends to the lead engineer the authorizing of overtime and has authority to decide which individual will work overtime; that there have been instances where a phase engineer has recommended discharge of casual laborers, and the lead engineer has carried it out, and where phase engineers have transferred casual labor between them.

424 F.2d at 1156–57.

In summary, the issue of whether AHN's are supervisors is a close one. As the Board's decision rests upon findings of fact, we must defer to it if the decision is supported by substantial evidence in the record, *Laborers & Hod Carriers Local No. 341 v. NLRB,* 564 F.2d 834, 837 (9th Cir. 1977), even though we might have decided the matter differently ourselves had the matter been presented *de novo. NLRB v. United Insurance Co.,* 390 U.S. 254, 260, 88 S.Ct. 988, 19 L.Ed.2d 1083 (1968). A review of the record reveals some conflict on this issue but there exists sufficient evidence to affirm the Board's decision on this point.

VI. *CONCLUSION*

For the reasons stated herein, the Board's petition for enforcement of its order is denied and the cause remanded to the Board for further action consistent with this opinion.