699 F.2d 626
 112 L.R.R.M. (BNA) 2908, 96 Lab.Cas. P 14,082
 The TRUSTEES OF the MASONIC HALL AND ASYLUM FUND, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
and
Service Employees International Union, Local 200, AFL-CIO, Intervenor.
 Nos. 299, 574, Dockets 82-4116, 82-4134.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 19, 1982.
Decided Feb. 14, 1983.
 
 Frank C. Morris, Jr., New York City (Richard G. Vernon, Richard J. Reibstein, Epstein, Becker, Borsody & Green, P.C., New York City, William W. Kelly, Penberthy, Kelly & Walthall, Utica, N.Y., of counsel), for petitioner.
 David S. Fishback, N.L.R.B., Washington, D.C. (William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, of counsel; Andrew F. Tranovich, N.L.R.B., Washington, D.C., on the brief), for respondent.
 Ira A. Sturm, Israelson, Manning & Raab, New York City, for intervenor-respondent.
 Before FEINBERG, Chief Judge, OAKES, Circuit Judge, and TENNEY, District Judge.*
 OAKES, Circuit Judge:
 
 
 1
 Once again a court of appeals is faced with a National Labor Relations Board health care institution unit determination. The issue posed is whether the Board, acting in an area in which it generally has broad discretion, has given due heed, first, to preventing proliferation of bargaining units in the health care industry, the congressional concern expressed in the legislative history of the 1974 Health Care Amendments to the National Labor Relations Act; and, second, to the admonitions of this and other circuits to balance traditional community of interest factors against the public interest in continuity of health care. While the Board has run into difficulty in this court and other courts of appeals by virtue of its seeming reluctance to give proper weight to the factor of "undue proliferation,"[1] we believe that the Board acted properly in this instance. Accordingly, we deny the petition to set aside the Board's decision and grant the cross-application for enforcement of an order requiring the employer to bargain with the union certified pursuant to a Board-supervised election.
 
 I.
 
 2
 The Masonic Hall and Asylum Fund is a fraternal nonprofit organization whose trustees engage in the operation of facilities known collectively as the Masonic Home: a licensed skilled nursing facility, a licensed health related nursing facility, and a licensed domiciliary or adult care facility, all at Utica, New York. The Trustees also operate a recreational facility forty miles from Utica. The skilled nursing facility has approximately 105 "guests" or patients, the health related facility 137, and the adult care facility also 137. The Trustees employ some 535 individuals, 475 of whom are nonsupervisory.
 
 
 3
 On June 21, 1981, the Service Employees International Union, Local 200, AFL-CIO (the Union) filed a petition with the National Labor Relations Board (the Board) to represent a unit of the Trustees' service and maintenance employees at these facilities. The Acting Regional Director directed an election after a hearing to determine the proper scope and composition of the bargaining unit. At the hearing, the Union amended its petition, which had specifically excluded technical employees, professional employees, business office clerical employees, confidential employees, guards, and supervisors, to exclude also the three full-time employees at the recreational facility. The Union sought to represent only service and maintenance workers, and would not represent a broader unit including technical, professional, or business office clerical workers.
 
 
 4
 The Trustees' position at the hearing was that only a "wall-to-wall" unit would be appropriate for purposes of collective bargaining in its health care facilities. While the employer and the union were in basic agreement as to some 370 employees in the service and maintenance unit,[2] the employer's position was that the unit should also include professional employees,[3] technical employees,[4] and business office clerical employees,[5] stipulating, however, that confidential employees,[6] supervisors,[7] seasonal employees, and guards[8] should be excluded. In its post-hearing brief, the employer took the position that the professional employees must be given the option to be included with nonprofessional employees in the bargaining unit, as provided for in Section 9(b)(1) of the National Labor Relations Act (NLRA), 29 U.S.C. Sec. 159(b)(1). On appeal, the Trustees argue that, in any event, the unit as determined was insufficiently inclusive.[9]
 
 
 5
 The Board concluded, however, that a service and maintenance unit was appropriate. The Board examined all employee classifications in terms of duties and functions, licensing and education requirements, record of transfer between classifications, pay grades, scheduling, and uniform requirements. In light of that analysis, "as well as the fact that a unit of service and maintenance employees has historically been found to be appropriate by the Board in health care institutions," the Acting Regional Director concluded that the certified unit of
 
 
 6
 [a]ll full-time and regular part-time service and maintenance employees employed by the Employer at its Utica, New York facility, excluding all technical employees, business office clerical employees, confidential employees, professional employees, guards, and supervisors as defined in the Act and all other employees
 
 
 7
 "cannot be said to constitute the sort of undue proliferation of bargaining units which Congress directed the Board to prevent." Decision and Direction of Election, Case 3-RC-8112 at 1, 6 (NLRB July 28, 1981). In all, the certified unit included 400 of the Masonic Home's 475 nonsupervisory employees.[10]
 
 
 8
 The Board denied the Trustees' request for review of the Regional Director's unit determination. The service and maintenance employees voted 188 to 125, with 8 challenged ballots, to be represented for collective bargaining purposes by the Service Employees International Union, Local 200, and the Board certified the election results on September 15, 1981. The Trustees, however, refused to bargain with the Union concerning rates of pay, wages, hours and other terms and conditions of employment of the workers in the unit, or to provide information requested by the Union. The Union therefore filed an unfair labor practice charge on October 5. The Board's General Counsel issued a complaint and later moved for summary judgment that the Trustees had violated NLRA Sec. 8(a)(5), 29 U.S.C. Sec. 158(a)(5), by refusing to bargain with the Board-certified representative. A three-member panel of the Board (Fanning, Jenkins, Zimmerman) granted the motion. 261 NLRB No. 49 (Apr. 29, 1982). Pursuant to NLRA Sec. 10(c), 29 U.S.C. Sec. 160(c), the Board ordered the Trustees to cease and desist from refusing to bargain collectively with the Union, and refusing to furnish the Union with requested information concerning the present terms and conditions of employees in the bargaining unit, as well as affirmatively to bargain and to post notices. The Trustees petition for review of this decision.
 
 II.
 
 9
 Before addressing the issues raised by the parties, we believe a discussion of the legislative context will be helpful.
 
 
 10
 A. Congress. The first step toward collective labor action under the NLRA is, of course, a petition to the Board seeking certification of an appropriate unit of employees who will then choose their bargaining representative in a Board-supervised election. The National Labor Relations Act sets out few standards to guide the Board's determination of an appropriate bargaining unit in the health care or any other industry. Section 9(b) enjoins the Board "to assure to employees the fullest freedom in exercising the rights guaranteed by [the NLRA]." 29 U.S.C. Sec. 159(b). The familiar section 7 rights include the right "to form, join, or assist labor organizations, [and] to bargain collectively through representatives of their own choosing ... [or] to refrain from any or all of such activities." 29 U.S.C. Sec. 157. Section 9(b) provides further standards for Board determination of units of professional employees, craftsmen, and guards. 29 U.S.C. Sec. 159(b). Congress delegated the duty to the Board to determine whether "the employer unit, craft unit, plant unit, or subdivision thereof" is the appropriate unit for collective bargaining purposes. Id. Prior organizing of the employees "shall not be controlling" in the Board's determination of the appropriate unit. NLRA Sec. 9(c)(5), 29 U.S.C. Sec. 159(c)(5).
 
 
 11
 Not until 1974 were employees in nonprofit health care institutions[11] able to organize within the protective structure of the NLRA. As the Supreme Court has noted, passage of the 1974 Health Care Amendments to the National Labor Relations Act
 
 
 12
 reflected Congress' judgment that hospital care would be improved by extending the protection of the Act to nonprofit health-care employees. Congress found that wages were low and working conditions poor in the health-care industry, and that as a result, employee morale was low and employment turnover high. Congress determined that the extension of organizational and collective-bargaining rights would ameliorate these conditions and elevate the standard of patient care. Congress also found that "the exemption [of nonprofit health care institutions] had resulted in numerous instances of recognition strikes and picketing. Coverage under the Act should completely eliminate the need for such activity, since the procedures of the Act will be available to resolve organizational and recognition disputes." S.Rep. No. 93-766, p. 3 (1974).
 
 
 13
 Beth Israel Hospital v. NLRB, 437 U.S. 483, 497-98, 98 S.Ct. 2463, 2471, 57 L.Ed.2d 370 (1978) (footnotes omitted).
 
 
 14
 At the same time, Congress enacted special provisions to protect the public interest in uninterrupted patient care, lengthening the strike notice provisions for unions in health care institutions, and requiring federal mediation. NLRA Sec. 8(d), (g), 29 U.S.C. Sec. 158(d)(A)-(C), (g). See also Beth Israel, 437 U.S. at 496 & n. 12, 98 S.Ct. at 2471 & n. 12 (discussing these provisions). Congress took no action, however, on a version proposed by Senator Taft that would generally have prevented Board approval of more than four units (professional employees, technical employees, clerical employees, and service and maintenance employees) in health care institutions.[12] But although it changed no statutory language regarding appropriate bargaining units, Congress did insert a directive in both the House and Senate Reports accompanying the final version of the bill that "[d]ue consideration should be given by the Board to preventing proliferation of bargaining units in the health care industry." S.Rep. No. 766, 93d Cong., 2d Sess. 5 (1974) reprinted in 1974 U.S.Code Cong. & Admin.News 3946, 3950.[13]
 
 
 15
 In debate, House co-sponsor Representative Ashbrook explained the Congressional admonition as an "accommodation ... needed to balance the rights of employees in nonprofit hospitals against the rights of the public for uninterrupted health care delivery." 120 Cong.Rec. 16900 (1974), reprinted in Sen. Subcomm. on Labor, Comm. on Labor & Public Welfare, 93d Cong., 2d Sess., Legislative History of the Coverage of Nonprofit Hospitals Under the National Labor Relations Act, 1974, Public Law 93-360 (S. 3203), at 290 (1974) [hereinafter cited as Legis.Hist.]. Senator Taft called it "a constructive compromise, as the Board should be permitted some flexibility in unit determination cases." 120 Cong.Rec. 12944 (1974), Legis.Hist. at 114. Although neither carefully explicated nor empirically supported, Congress recognized a nexus between a "proliferation of bargaining units in the health care industry" and disruption in patient care.
 
 
 16
 A primary goal of the 1974 amendments was to provide a nondisruptive mechanism for union recognition. Speaking on the floor, Senator Cranston emphasized that twice as many health care industry work days were lost through recognition strikes as through strikes over contract terms. 120 Cong.Rec. 12937 (1974), Legis.Hist. at 92. Senator Williams stated that "[t]he recognition strike is the primary and most disruptive form of labor conflict in nonprofit hospitals. It accounts for 95 percent of the strikes in these hospitals." 120 Cong.Rec. 12938 (1974), Legis.Hist. at 96. See also 120 Cong.Rec. 12970 (1974), Legis.Hist. at 147 (remarks of Sen. Taft). The amendments created an alternative to strikes, an official route to union recognition that would improve the continuity of patient care. Congress evidently thought that the fewer the units, the fewer the recognition conflicts. "Unwarranted unit fragmentation leading to jurisdictional disputes and work stoppages must be prevented." 120 Cong.Rec. 12944 (1974), Legis.Hist. at 114 (remarks of Sen. Taft).
 
 
 17
 Further, the congressional admonition against undue proliferation of bargaining units sought to minimize administrative burdens. As Senator Taft, a prime sponsor, remarked in floor debate, "[i]f each professional interest and job classification is permitted to form a separate bargaining unit, numerous administrative and labor relations problems become involved in the delivery of health care." Id., Legis.Hist. at 113. Finally, Congress apparently understood a connection between its nonproliferation policy and the need to contain rising costs of medical care. More units, it was argued, would increase the possibility of whipsaw strikes and wage leapfrogging. 120 Cong.Rec. 12945 (1974), Legis.Hist. at 114 (remarks of Sen. Taft).[14]
 
 
 18
 B. Courts. Outside the health care field, the Board's bargaining unit determinations are "rarely to be disturbed," Packard Motor Co. v. NLRB, 330 U.S. 485, 491, 67 S.Ct. 789, 793, 91 L.Ed. 1040 (1947), cited with approval in South Prairie Construction Co. v. Local 627, 425 U.S. 800, 805, 96 S.Ct. 1842, 1844, 48 L.Ed.2d 382 (1976) (per curiam). Such determination can be set aside only if arbitrary, unreasonable, or not supported by substantial evidence. NLRB v. Hudson River Aggregates, Inc., 639 F.2d 865, 871 (2d Cir.1981); Szabo Food Services, Inc. v. NLRB, 550 F.2d 705, 707 (2d Cir.1976). In exercising this discretion we have often recognized that the Board's determination is principally based on "whether the ... employees have a sufficient community of interest to be an appropriate unit." Wheeler-Van Label Co. v. NLRB, 408 F.2d 613, 617 (2d Cir.) (citing United Aircraft Corp. v. NLRB, 333 F.2d 819, 822 (2d Cir.1964), cert. denied, 380 U.S. 910, 85 S.Ct. 893, 13 L.Ed.2d 796 (1965)), cert. denied, 396 U.S. 834, 90 S.Ct. 90, 24 L.Ed.2d 84 (1969).
 
 
 19
 Where a court ordinarily would defer to the Board's unit determination as long as the basis is articulated and not arbitrary "when viewed against the backdrop of other Board decisions and a statute which has given the agency broad discretion," Local 1325, Retail Clerks International Association v. NLRB, 414 F.2d 1194, 1201 (D.C.Cir.1969), courts regularly deny enforcement of Board orders relating to the health care unit certification, chastising the Board for its failure to adhere to congressional policy to prevent undue proliferation of bargaining units. Thus, although the statute says nothing about units in the health care industry, courts have vigorously applied their reading of the legislative history of the 1974 extension of the NLRA to employees in nonprofit health care facilities. See cases cited supra note 1.
 
 
 20
 In particular, this court has stated clearly that this legislative commitment to nonproliferation, explicit in the legislative history, binds the NLRB in its determination of the appropriate collective bargaining unit in a health care institution. When the National Labor Relations Board
 
 
 21
 makes a unit determination for health care institution employees, traditional community of interest factors "must be put in balance against the public interest in preventing fragmentation in the health care field." St. Vincent's v. N.L.R.B., supra, 567 F.2d at 592. The Board in its decision must specify "the manner in which its unit determination ... implement[s] or reflect[s] that admonition ...." NLRB v. West Suburban Hospital, supra, 570 F.2d at 216.
 
 
 22
 NLRB v. Mercy Hospital Association, 606 F.2d 22, 27 (2d Cir.1979) (footnote omitted), cert. denied, 445 U.S. 971, 100 S.Ct. 1665, 64 L.Ed.2d 248 (1980).
 
 
 23
 We believe that this is the legal standard by consensus of the circuits. See, e.g., Beth Israel Hospital and Geriatric Center v. NLRB, 688 F.2d 697, 700 (10th Cir.1982) (en banc), petition for cert. dismissed, --- U.S. ----, 103 S.Ct. 433, 74 L.Ed.2d 522 (1982) (certifying health care unit of registered nurses without stating how Board's determination complies with Congress' admonition is abuse of discretion); NLRB v. HMO International/California Medical Group Health Plan, Inc., 678 F.2d 806, 809-10 (9th Cir.1982) (declining to evaluate nonproliferation policy in adequate and specific terms is serious administrative error) (remand to Board; unit of registered nurses); Mary Thompson Hospital, Inc. v. NLRB, 621 F.2d 858, 863 (7th Cir.1980) (omitting discussion of congressional policy fatal) (enforcement denied; unit of four licensed stationary engineers); Memorial Hospital v. NLRB, 545 F.2d 351, 361 (3d Cir.1976) (granting comity to state agency's unit determination oversteps legislative policy and is abuse of discretion) (enforcement denied; unit of maintenance workers, excluding service employees). See also Long Island Jewish-Hillside Medical Center v. NLRB, 685 F.2d 29 (2d Cir.1982) (registered nurses); Presbyterian/St. Luke's Medical Center v. NLRB, 653 F.2d 450 (10th Cir.1981) (registered nurses), modified by Beth Israel Hospital and Geriatric Center, 688 F.2d 697 (10th Cir.1982) (en banc), petition for cert. dismissed, --- U.S. ----, 103 S.Ct. 433, 74 L.Ed.2d 522 (1982); Allegheny General Hospital v. NLRB, 608 F.2d 965 (3d Cir.1979) (maintenance workers); NLRB v. St. Francis Hospital, 601 F.2d 404 (9th Cir.1979) (nurses); NLRB v. West Suburban Hospital, 570 F.2d 213 (7th Cir.1978) (maintenance workers); St. Vincent's Hospital v. NLRB, 567 F.2d 588 (3d Cir.1977) (boiler room employees); Long Island College Hospital v. NLRB, 566 F.2d 833 (2d Cir.1977) (maintenance workers and engineers), cert. denied, 435 U.S. 996, 98 S.Ct. 1647, 56 L.Ed.2d 84 (1978).
 
 
 24
 When the Board has certified broad units of technical and/or service and maintenance workers, the courts have applied the same legal standard, albeit requiring a lesser showing of Board articulation of the congressional mandate. See Vicksburg Hospital, Inc. v. NLRB, 653 F.2d 1070 (5th Cir.1981) (approving unit of nonprofessional service, maintenance, and technical workers when employer sought two units); NLRB v. Sweetwater Hospital Association, 604 F.2d 454 (6th Cir.1979) (approving unit of all technical employees when union originally sought to represent only licensed practical nurses (LPNs) and employer sought unit of all nonprofessional employees); Bay Medical Center, Inc. v. NLRB, 588 F.2d 1174 (6th Cir.1978) (approving unit of technical employees not including LPNs when Board expressly considered Congress' admonition), cert. denied, 444 U.S. 827, 100 S.Ct. 53, 62 L.Ed.2d 35 (1979).
 
 III.
 
 25
 Our task on review, then, is to determine whether the Board's certification of a unit of service and maintenance workers at the Masonic Home comports with the legal standard, and is factually supported by substantial evidence. We note, however, that in the analysis that follows we have made explicit the balancing of employees' right to exercise section 7 rights with the congressional admonition against undue proliferation of bargaining units in the health field. The Board itself should have been similarly explicit, but was not. We have nevertheless decided to enforce its order for reasons set forth below. But that we have done so here does not mean that we will do so in the future, and the Board would be well advised to explicitly make such findings in future cases.
 
 
 26
 A. The Legal Standard. The Trustees' principal legal argument before us is that the Board's unit determination is erroneous and contrary to the congressional admonition against undue proliferation, as interpreted by the courts of appeals. This argument has several subsidiary branches: that the Board failed to take into account the public interest because it improperly relied solely on its traditional industrial "community of interest" test, contrary to Mercy Hospital, 606 F.2d at 25-27; utilized impermissible presumptive and evidentiary devices and failed to address the particular facts of this health care facility as required by Long Island-Jewish Hillside Medical Center, 685 F.2d at 34-35, and Mercy Hospital, 606 F.2d at 28; and failed to analyze whether there was a "disparity of interests," between service and maintenance and all other employees, the test proposed by the Ninth and Tenth Circuits. See HMO International, 678 F.2d at 808, citing St. Francis Hospital, 601 F.2d at 419; Presbyterian/St. Luke's Medical Center, 653 F.2d at 456-57.[15]
 
 
 27
 The Board's defense also has several prongs, expanding in its appellate brief the Acting Regional Director's sketchy reasoning. The Board emphasizes, correctly, we believe, that employees at the Masonic Home have a right to organize, and that the Union did not seek to represent other than service and maintenance employees.[16] Next, the Board emphasizes that a limitation on unit categories, the Taft bill, supra note 12 and accompanying text, was not enacted; the Health Care Amendments, therefore, favored a flexible approach to unit determination. Had Taft's four-unit limitation passed, the Board stresses, a service and maintenance unit would have been specifically authorized. Finally, the Board, on the one hand, cites cases recognizing the appropriateness of service and maintenance units, and on the other, distinguishes courts' remands or denials of enforcement as not involving service and maintenance units.
 
 
 28
 At the outset, we note that the Health Care Amendments, while requiring the Board to consider the public interest, did not remove the statutory requirement that the Board's unit determinations "assure to employees the fullest freedom in exercising the rights guaranteed" by the Act, NLRA Sec. 9(b), 29 U.S.C. Sec. 159(b), or the established principle that in selecting between several alternative units, the statute does not compel the Board to choose "the most appropriate" unit, but only "an" appropriate unit from the range of possible choices. See MPC Restaurant Corp. v. NLRB, 481 F.2d 75, 78 (2d Cir.1973); Wheeler-Van Label Co., 408 F.2d at 617. In the continuing effort to move the Board to articulate the balancing approach that Congress has requested, we must not forget to acknowledge that the main thrust of the Health Care Amendments was to foster labor organizing under the aegis of the National Labor Relations Board. Congress, we reiterate, concluded that there was "no acceptable reason why 1,427,012 employees of ... non-profit, non-public hospitals, representing 56% of all hospital employees, should continue to be excluded from the coverage and protections of the Act." Sen.Rep. No. 766, 93d Cong., 2d Sess. 3 (1974), reprinted in 1974 U.S.Code Cong. & Ad.News 3946, 3948 and in Legis.Hist. at 10. A conclusion we draw from our review of the legislative history of the Health Care Amendments is that it does not direct the courts or the Board to erect obstacles to certification of bargaining units that are broader and higher than Congress was itself willing to enact, although a concept underlying the statute is that fewer units may promote institutional peace in health care facilities.
 
 
 29
 To state this is not to detract from the concern of our court and other circuit courts of appeals that have in specific instances found that the Board's determination in and of itself led to undue proliferation or failed to demonstrate in its findings that undue proliferation was a factor considered in making the health care unit determination. In particular, we have difficulty with the Acting Regional Director's cursory explanation of his ratiocination, and with the Board's technically correct, but substantively useless, decision on summary judgment.[17] We will, however, permit the decision to stand, for the following reasons.
 
 
 30
 First, by citing Nathan and Miriam Barnert Memorial Hospital Association, 217 NLRB 775 (1975), and Newington Children's Hospital, 217 NLRB 793 (1975), for the proposition that "the establishment of a service and maintenance unit cannot be said to constitute the sort of undue proliferation of bargaining units which Congress directed the Board to prevent," the Acting Regional Director incorporated by reference the reasoning of those two cases, which spell out in some depth a recognition of the special considerations applicable to unit determination in the health care field. See Nathan and Miriam Barnert Memorial Hospital Association, 217 NLRB at 776-77 & nn. 21-27; Newington Children's Hospital, 217 NLRB at 793-94.
 
 
 31
 In Barnert, a union petitioned to represent separate units of service and maintenance employees and technical employees, and the Board so certified, although the employer argued for a consolidated unit. An indication of the Board's attention to the nonproliferation mandate was its doubling of the size of the proposed technical unit by inclusion of all LPNs, although the parties had stipulated not to classify LPNs as technical employees. The Board found the stipulation contrary to its inclusive unit policy, at the same time that it found that separate units of service and maintenance workers and technical employees were reasonable because of the latter's specialized training, skills, education, licensing, and job requirements. 217 NLRB at 776, 780. In Newington, the same union petitioned to represent service and maintenance employees, excluding technical employees. The Board approved the unit, reiterating its experienced view that the two groups have sufficiently distinct interests, and emphasizing that "the establishment of both a service and maintenance unit and technical unit cannot realistically be said to constitute the sort of undue proliferation of bargaining units which the Congress directed the Board to prevent." 217 NLRB at 794 (emphasis added).
 
 
 32
 As does the Board in the case before us, the Board in Barnert emphasized that a unit of service and maintenance workers would have been appropriate under "[e]ven the most narrow of the bills offered [Senator Taft's] to extend coverage of the Act to nonprofit hospitals." 217 NLRB at 777 n. 25. The bill as passed, of course, permitted Board flexibility to determine appropriate bargaining units using its specialized expertise. The Board reasoned that a unit that matches one of Senator Taft's--professional employees, technical employees, clerical employees, and service and maintenance employees--would, realistically, be nonproliferative. Id.; see also Newington, 217 NLRB at 794.
 
 
 33
 We do not adopt the per se approach implicit in this analysis of the quite inconclusive significance of the Taft version of the bill. As Judge Kennedy has noted, "[t]hese divisions were not enacted, and it is not clear whether they were thought to be too broad, too narrow, or merely too rigid." HMO International, 678 F.2d at 808. We do adopt, however, an approach that emphasizes realism.
 
 
 34
 Thus, our second reason for finding that the Board complied with the congressional mandate in the case before us is that the Board did not rubber stamp the union petition, but rather added a number of specific positions--thirty employees--to the proposed unit. The unit as certified included 400 of 475 nonsupervisory employees. Realistically, this numerically inclusive unit is distinguishable from other unit cases. For example, in Long Island Jewish-Hillside Medical Center, 685 F.2d 29, a unit scope case, we held it error for the Board to use the single facility presumption in determining that 80 registered nurses in a single division were an appropriate unit, when the medical center employed 630 registered nurses in its three divisions. The potential for whipsawing and consequent disruption of health care services, which the nonproliferation policy addresses, is patent. In Mercy Hospital, 606 F.2d 22, we rejected a unit of 23 maintenance workers out of 1,287 employees. In St. Vincent's Hospital, 567 F.2d 588, the Third Circuit rejected a unit of four boiler operators and three maintenance employees in a hospital employing 280 workers, others of whom were also maintenance employees.
 
 
 35
 A Board decision that extensively discusses the unit certification issue in light of the Health Care Amendments expresses our point. In Newton-Wellesley Hospital, 250 NLRB 409 (1980), a union petitioned to represent all registered nurses, approximately three-quarters of the employer's professional employees. The Board, while noting that "unit size is not a controlling factor in Board unit determinations," id. at 414, found that factor relevant to Congress' admonition against unit proliferation. The Board relied on its own casehandling experience over the six years since passage of the Health Care Amendments, and concluded that, if organized, the remaining professionals (mental health counselors) would constitute at most one additional "substantial-in-size" bargaining unit. Id. at 414-15. In the case before us, Board precedent similarly makes it clear that, at most, the Masonic Home's nonprofessional employees might potentially form two units: service and maintenance, and technical. Professional employees and administrative employees (business office clericals) might form two additional units. The unit we are asked to approve, of course, contains fully eighty-four percent of the nonsupervisory employees.
 
 
 36
 This case, therefore, seems to us to be closer to the few cases upholding the Board's unit determination than the more numerous cases remanding or denying enforcement. In Vicksburg Hospital, Inc. v. NLRB, 653 F.2d 1070 (5th Cir.1981), the union and employer took positions opposite from the parties before us today. The union petitioned to represent a unit of nonprofessional service and maintenance and technical employees (LPNs), excluding business office clericals and professionals. The Board, "mindful of the congressional mandate," id. at 1075, approved the unit. The employer sought to split the workers into separate units: service and maintenance, and technical. Id. at 1072. Yet the Board's opinion affirming the Regional Director's unit determination is devoid of any reference to the public policy implicit in the congressional mandate. Vicksburg Hospital, Inc., 251 NLRB 6 (1980). Rather, the Board was able to approve the broader unit on the particular circumstances of the Vicksburg Hospital, finding on substantial evidence that the technical employees, who would normally constitute a separate unit, had pervasive commonality of interests with service and maintenance workers at Vicksburg Hospital. 653 F.2d at 1073-75. This is precisely what the Board failed to find on the particular circumstances of the Masonic Home. Since there is substantial evidence to support the Board's findings of fact, see discussion infra, we defer to the Board, as did the Vicksburg panel.
 
 
 37
 That is to say, an indicator that the Board has indeed engaged in the balancing approach mandated by Congress is its certifying the largest possible unit in which it finds, on the particular circumstances of the health care institution before it, that employees share interests such that they can be said to speak with one, rather than with conflicting voices on the issues of "collective bargaining or other mutual aid or protection," NLRA Sec. 7, 29 U.S.C. Sec. 157, such as "grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work." NLRA Sec. 2(5), 29 U.S.C. Sec. 152(5). Even if the Board has failed to include words of reference to the congressional policy (and considering its record of reversals, the Board acts foolishly in omitting or glossing over this explicit discussion), a court of appeals can infer from the Board's result that it has taken the nonproliferation policy into account.
 
 
 38
 NLRB v. Sweetwater Hospital Association, 604 F.2d 454 (6th Cir.1979), provides another example of enforcement of the Board's unit determination where the court focused on what the Board did as much as on what it said. There, the union petitioned for an LPN unit; the employer sought a unit of its entire nonprofessional, nonadministrative work force; and the Board certified neither, but instead defined an inclusive unit of all technical employees. The Board relied on Newington Children's Hospital, 217 NLRB 793, and Nathan and Miriam Barnert Memorial Hospital Association, 217 NLRB 775 (1975), the same cases it relies on here, for the proposition "that LPN's are properly classified as technical employees and that technical employees share a community of interest separate and distinct from that of service and maintenance employees." 604 F.2d at 456. Compare Bay Medical Center, Inc. v. NLRB, 588 F.2d 1174 (6th Cir.1978) (technical unit excluding LPNs), cert. denied, 444 U.S. 827, 100 S.Ct. 53, 62 L.Ed.2d 35 (1979). Thus, although the Board's acknowledgment of the congressional mandate to avoid undue proliferation of bargaining units in the health care industry was confined to a footnote and Member Penello's dissent, see Sweetwater Hospital Association, 228 NLRB 1300, 1300 n. 2, 1303 (1977), it surely acknowledged the mandate in point of fact.
 
 
 39
 We are not troubled by the fact that the Board reached different unit determinations in the two cases we have just discussed (in Vicksburg, a combined service and maintenance/technical unit, in Sweetwater, a technical unit), or that the Sixth Circuit could, within eight months, enforce orders in seemingly contradictory unit certifications (in Sweetwater, an LPN unit including all other technicals, in Bay Medical Center, a technical unit excluding LPNs, because they were already represented). If the Board gives due heed to Congress, and looks at the employment circumstances at each health care institution, it is inevitable that in certain cases certified units will not be consistent. Identity of classifications would be a per se approach that a balancing requirement precludes, and though the Board will have to explain different results in different cases, balancing in this area precludes absolute uniformity. Just so, the Board would abuse its discretion were it to make a unit determination in the health care field solely on the basis of a presumption of appropriateness. This is not because to do so offends Federal Rule of Evidence 301 in that it impermissibly shifts the burden of proof,[18] but because in the health care field, the Board must specify how its unit determination implements or reflects the congressional admonition. Mercy Hospital, 606 F.2d at 27. Just as there is no presumption in favor of a smaller unit, Long Island-Jewish Hillside Medical Center, 685 F.2d 29, there is no presumption in favor of a wall-to-wall unit. And while the Board may certify a wall-to-wall unit, Mon Valley United Health Services, Inc., 238 NLRB 916, 921, 923-25 (1978), it certainly is not the only appropriate unit in a given situation. The Board is committed to evaluating each unit petition on the facts. Newton-Wellesley Hospital, 250 NLRB at 415.
 
 
 40
 B. Substantial Evidence. A unit determination must be supported by substantial evidence in the record in order to be enforced. See Niagara University v. NLRB, 558 F.2d 1116, 1118 (2d Cir.1977) and cases cited therein.
 
 
 41
 The Trustees' principal factual argument made before the Hearing Officer was that all of the tasks comprising the operation of the nursing home were highly interdependent, creating a commonality of interest cutting across job classifications, and thus a bargaining unit composed only of service and maintenance employees was too restrictive to be appropriate. The Trustees noted that the service and maintenance unit would exclude, for example, both licensed practical nurses and registered nurses, who worked closely with nurses' aides, orderlies, and ward clerks in an interdependent team method of providing direct patient care services. The Trustees introduced evidence of centralized administration, common personnel policies, and wage and benefit plans to bolster the argument that there was no significant disparity of interest among virtually all of the employees at its health care and recreational facilities. Finally, the Trustees introduced evidence of the staffing differences between chronic and acute care institutions, and of the prior organizational history of its own and other upstate New York health and nursing facilities.
 
 
 42
 The Acting Regional Director recognized that there were some examples in the record where service and maintenance employees have "some duties and functions" that are "similar in nature" to the duties and functions of LPNs and RNs, but he also found that orderlies, aides, and attendants who do come into contact with patients, guests and residents "provide a level of care subordinate to that which can only be provided by licensed personnel or those with advanced educational qualifications." Although all job openings are posted, actual transfer between classifications was not significant; the Acting Regional Director noted that service and maintenance workers transferred to technical jobs only when they met the requisite licensing, skill or educational requirements. We think that these were significant factors that the Board could, and routinely does, properly take into account. See, e.g., A.W. Schlesinger Geriatric Center, Inc., 260 NLRB No. 58, reprinted in NLRB Dec. (CCH) p 18,744 (Feb. 25, 1982) (reversing Regional Director's certification of combined unit of technical and service and maintenance employees, finding latter unit, sought by union, appropriate). See also William W. Backus Hospital, 220 NLRB 414 (1975) (separate service and maintenance and technical units appropriate given differences in training, experience, and functions of two groups).
 
 
 43
 The facts that the Masonic Home has some geographic cohesiveness,[19] centralized administration, and personnel and benefits policies applicable to all nonsupervisory employees go to support the appropriateness of a wall-to-wall unit, but fall far short of establishing that such a unit would be the only appropriate one. We read no such presumption into the Health Care Amendments to the NLRA. The congressional policy "does not mean that all non-professional hospital employees must be covered by a single unit." Sweetwater Hospital Association, 604 F.2d at 458. Community of interest--such factors as employees' duties, skills, working conditions, wages, hours, interchangeability with other employees and physical proximity; employee desires; and extent and history of union organization--must be analyzed in all unit determinations. See generally J. Abodeely, R. Hammer & A. Sandler, The NLRB and the Appropriate Bargaining Unit 13-83 (rev. ed. 1981).
 
 
 44
 The Acting Regional Director also noted that there were ten pay grades covering all of the various job classifications at the Masonic Home. The first grade, with a wage range of $3.45 to $4.85 an hour, represented 315 people. Thus, eighty-five percent of the employees agreed by the parties to be within the service and maintenance unit were in the lowest wage grade, which included no employees agreed by the parties to be business office clerical, technical or professional employees. See notes 2-5 supra. The employer argues that the Acting Regional Director failed to take into account that some service and maintenance employees are classified as high as pay-grade eight, while business office clerical employees are classified as low as pay-grade two. We note that only the preventive maintenance and maintenance mechanics' positions were above pay-grade three, although the pay-grade six printer, barber, and beauticians voted subject to challenge. Most of the business office clericals were between pay-grades four and six; only an administration building receptionist and a residence personal accounts clerk were in pay-grade two. Thus, for the most part the service and maintenance workers are the lowest paid employees of the Masonic Home. Having in mind that the technical employees range between pay-grades seven and nine, the professionals between pay-grades eight and ten, and some technicals and professionals are paid on a salaried basis, we think that the Acting Regional Director's findings of commonality of interests of service and maintenance employees on the basis of pay are substantially supported.
 
 
 45
 Additionally, he compared hours of work, and uniform requirements. Most of the service and maintenance employees worked six-day weeks in various shifts covering a twenty-four hour day. The business office clericals and some technicals, on the other hand, worked five-day weeks and an eight-to-five shift. Service and maintenance workers pay for their own required uniforms, while clerical workers have no uniform requirement, although they do have a dress code. We think the evidence supported the findings that what is in effect the blue collar nature of the service and maintenance employees' work differentiates their interests from those of business office and technical personnel. We note in this connection that only one office clerical works outside the administration building for a few hours each day; she was properly found to be more closely aligned with the business office clericals even though she handled residents' accounts. We also note that the Acting Regional Director was not simply the Union's rubber stamp in respect to the bargaining unit; he included receptionists in the health facility, skilled nursing care facility, and the adult care facility in the unit since "their work and working conditions are materially related to unit work." These employees relay messages to employees and physicians, staff the desks twenty-four hours a day, and are relieved at breaks at the end of shift by ward clerks and aides (service and maintenance employees). He permitted the medical records secretaries located on the first floor of the health facility to vote subject to challenge, finding the evidence insufficient to classify them, but found that the warehouse store clerks, shipping/receiving clerk, inventory control clerk, and the purchasing secretary should clearly be included in the unit because of their interaction with service and maintenance employees.
 
 
 46
 Finally, although bargaining history at a given institution is a relevant consideration in determining appropriate units, Bay Medical Center, 588 F.2d at 1177, there is no true history here. Rather, the record shows four unsuccessful efforts to create wall-to-wall units,[20] from which the Board, and this court, could infer the inappropriateness of the wall-to-wall unit.
 
 
 47
 We hold in short that there was substantial evidence to support the Acting Regional Director's findings that a unit of service and maintenance employees at the Masonic Home is appropriate for purposes of collective bargaining. The service and maintenance workers share a cohesive identity, albeit "all the employees from the most highly educated to the most menial all share the common goals of making life more bearable and productive for those of us enjoying their golden years or suffering from physical or mental ailments." But "however great the common interests shared collectively by the individuals, there are more interests which separate them, than unite them." Union Br. at 26.
 
 IV.
 
 48
 We are asked by the Trustees to require the Board to employ the "disparity of interests" test called for by the Ninth and Tenth Circuits. That test, taken from the language if not the thought of Senator Williams set forth in the margin,[21] see NLRB v. St. Francis Hospital, 601 F.2d at 418-19, begins with a broad proposed unit and then excludes employees with disparate interests. "Separate bargaining units in the health care field," a panel of the Ninth Circuit states, "must be justified in terms of a disparity that precludes combination, not an internal consistency within a class that could justify separation." HMO International, 678 F.2d at 812 n. 17 and cases cited therein (emphasis in the original).
 
 
 49
 The Board has written that its "inquiry is always whether the interests of these employees are sufficiently distinct to justify the exclusion," Newton-Wellesley Hospital, 250 NLRB at 411 n. 6, and thus "the test of 'disparateness' described by the court is, in practice, already encompassed logically within the community-of-interest test as we historically have applied it." Id. at 412.
 
 
 50
 Consistent with our analysis of the Board's practice, supra, we certainly would not reject this suggestion. But in any case, the Board here argues, and we agree, that a rigid "disparity of interests" test is inconsistent with the compromise struck by Congress, a compromise that was "carefully tailored," 120 Cong.Rec. 12939 (1974), Legis.Hist. at 98 (remarks of Sen. Javits), and represented a "finely tuned balance of competing considerations and philosophies to develop a procedure that will, at the same time, protect labor and management rights and promote good health care." 120 Cong.Rec. 12936 (1974), Legis.Hist. at 91 (remarks of Sen. Cranston).
 
 
 51
 Further, although extent of prior organizing is not determinative in finding that a petitioned-for unit is appropriate, NLRA Sec. 9(c)(5), 29 U.S.C. Sec. 159(c)(5), a rigid disparity of interests test suggests that a union has some obligation to petition to represent wall-to-wall units, rather than units of employees whose interests the particular union may best understand. One by-product of the Health Care Amendments, and of the Board's paying "due heed" to the congressional mandate against nonproliferation of bargaining units, is that the Board's approval of large, heterogeneous units has forced smaller, specialized craft unions to merge, affiliate, or make internal changes in order to survive. J. Abodeely, R. Hammer & A. Sandler, supra, at 284-288. In 1979, the Service Employees International Union, District 1199 (whose Local 200 is the intervenor in this case), together with the American Nurses Association, represented seventy-eight percent of all health care employees covered by collective bargaining agreements. Id. at 288, citing Federal Mediation and Conciliation Service, United States Dep't of Labor, Impact of the 1974 Health Care Amendments to the NLRA on Collective Bargaining in the Health Care Industry 67 (1979). As a result, health care employees now have fewer choices, although that is not to say they have any less effective representation. The public benefits, the argument goes, because health care institutions have "fewer contracts to bargain about and administer, less chance of whipsawing and multiple strikes, and more labor stability." J. Abodeely, R. Hammer & A. Sandler, supra, at 289-90. Empirical data is not before us, nor is it for the court to weigh the costs and benefits of the nonproliferation policy. In rejecting the rigid "disparity of interests" test, however, we do emphasize that nothing in the statute or the legislative history requires the Board to begin its consideration of the appropriateness of a unit with a presumption in favor of wall-to-wall units. Such a test, we believe, would unnecessarily restrict the employees' right to choose their bargaining representative.
 
 
 52
 Petition to review and set aside the Board's order denied. Petition to enforce granted.
 
 
 
 *
 Of the Southern District of New York, sitting by designation
 
 
 [1]
 See, e.g., Long Island Jewish-Hillside Medical Center v. NLRB, 685 F.2d 29 (2d Cir.1982); NLRB v. HMO Int'l/California Medical Group Health Plan, Inc., 678 F.2d 806 (9th Cir.1982); Beth Israel Hosp. & Geriatric Center v. NLRB, 677 F.2d 1343 (10th Cir.1981), modified, 688 F.2d 697 (10th Cir.1982) (en banc), petition for cert. dismissed, --- U.S. ----, 103 S.Ct. 433, 74 L.Ed.2d 522 (1982); St. Anthony Hosp. Sys. v. NLRB, 655 F.2d 1028 (10th Cir.1981), modified sub nom. Beth Israel Hosp. & Geriatric Center v. NLRB, 688 F.2d 697 (10th Cir.1982) (en banc), petition for cert. dismissed, --- U.S. ----, 103 S.Ct. 433, 74 L.Ed.2d 522 (1982); Presbyterian/St. Luke's Medical Center v. NLRB, 653 F.2d 450 (10th Cir.1981), modified by Beth Israel Hosp. & Geriatric Center, 688 F.2d 697 (10th Cir.1982) (en banc), petition for cert. dismissed, --- U.S. ----, 103 S.Ct. 433, 74 L.Ed.2d 522 (1982); Mary Thompson Hosp., Inc. v. NLRB, 621 F.2d 858 (7th Cir.1980); Allegheny Gen. Hosp. v. NLRB, 608 F.2d 965 (3d Cir.1979); NLRB v. Mercy Hosp. Ass'n, 606 F.2d 22 (2d Cir.1979), cert. denied, 445 U.S. 971, 100 S.Ct. 1665, 64 L.Ed.2d 248 (1980); NLRB v. St. Francis Hosp., 601 F.2d 404 (9th Cir.1979); NLRB v. West Suburban Hosp., 570 F.2d 213 (7th Cir.1978); St. Vincent's Hosp. v. NLRB, 567 F.2d 588 (3d Cir.1977); Long Island College Hosp. v. NLRB, 566 F.2d 833 (2d Cir.1977), cert. denied, 435 U.S. 996, 98 S.Ct. 1647, 56 L.Ed.2d 84 (1978); Memorial Hosp. v. NLRB, 545 F.2d 351 (3d Cir.1976)
 Courts also have approved unit determinations and enforced Board orders. See, e.g., Vicksburg Hosp., Inc., 251 NLRB 6 (1980), enforced, 653 F.2d 1070 (5th Cir.1981); Sweetwater Hosp. Ass'n, 228 NLRB 1300 (1977), enforced, 604 F.2d 454 (6th Cir.1979); Bay Medical Center, Inc., 224 NLRB 69 (1976), enforced, 588 F.2d 1174 (6th Cir.1978), cert. denied, 444 U.S. 827, 100 S.Ct. 53, 62 L.Ed.2d 35 (1979).
 The full Board issued an important decision after completion of briefing and oral argument in the present case. St. Francis Hospital, 265 NLRB No. 120, reprinted in NLRB Dec. (CCH) p 15,504 (Dec. 16, 1982). We need take no position on the majority's delineation of a two-step procedure in health care institution unit determinations.
 
 
 [2]
 The parties stipulated that the following classifications are in the service and maintenance unit should it be found appropriate:
 Orderly, nurses' aide, nurses' assistant, attendant, personal care aide, resident care aide, patient property attendant, Transfer orderly, head orderly, ward clerk, physical therapy aid activity leader, cook, diet aide, utility personnel, diet scheduling clerk, maid, custodian, linen room attendant, carpenter, maintenance mechanic, preventative maintenance mechanic, painter, upholsterer, boiler room attendant, grounds attendant, maintenance clerk, driver, central supply attendant and pharmacy aide.
 The parties differed as to other classifications. The Union asked to exclude the receptionist, medical records secretaries, warehouse store clerk, shipping and receiving clerk, inventory control clerk and purchasing secretary, as business office clericals; the Trustees classified them as service and maintenance workers. The Union included the barber and beautician in the service and maintenance unit, while the Trustees contended they were technical employees. The Union contended that the printer was not a regularly scheduled employee; the Trustees included him in the service and maintenance unit. The Union excluded the camp caretaker and camp housekeeper from the service and maintenance unit, whereas the Trustees included both titles.
 
 
 [3]
 The parties stipulated and the Acting Regional Director found that the following classifications are professional employees within the meaning of the Act, 29 U.S.C. Sec. 152(12):
 Registered nurse, occupational therapist, physician, speech therapist, rehabilitation nurse, clinician, laboratory technologist, pharmacist and social work assistant.
 Professional employees may not, without their consent, be represented by a unit also representing nonprofessionals. NLRA Sec. 9(b)(1), 29 U.S.C. Sec. 159(b)(1). See NLRB v. St. Luke's Hosp. Center, 551 F.2d 476, 477 (2d Cir.1976).
 
 
 [4]
 The parties further stipulated, and the Acting Regional Director found that the following classifications of employees are technical employees as the Board defines that term:
 Licensed practical nurse, medical records technicians, dental hygienist, chief X-ray technician, diet technician, electrician and first cook.
 
 
 [5]
 The parties stipulated and the Acting Regional Director found that the following classifications of employees are business office clerical employees:
 Resident's accounts clerk, accounts payable clerk, payroll clerk, reimbursement clerk and bookkeeper.
 
 
 [6]
 Based on their access to employer material relating to the formulation and effectuation of labor policy, the parties stipulated and the Acting Regional Director found that the following classifications are confidential employees as the Board defines that term:
 Interviewer, insurance clerk, personnel clerk, secretary/receptionist to the Director of Nursing, secretary to the Personnel Director, secretary to the Executive Director and secretary to the Comptroller.
 
 
 [7]
 Supervisors are not employees within the meaning of the NLRA, 29 U.S.C. Sec. 152(3), because they represent the employers' interests in labor relations. See 29 U.S.C. Sec. 152(11)
 
 
 [8]
 The Board is precluded from finding a unit appropriate if it includes guards together with other employees. 29 U.S.C. Sec. 159(b)(3)
 
 
 [9]
 The union intervenor, Service Employees International Union, Local 200, AFL-CIO argues that the employer, having argued for a wall-to-wall unit in the representation proceeding cannot argue now in the unfair labor practice proceeding that other units are appropriate, such as a unit of service, maintenance, and technical employees. It is generally true that a party failing to raise an issue at the appropriate time effectively waives the right to raise it subsequently. See 3 K. Davis, Administrative Law Treatise Sec. 20.06 (1958). But the original burden was on the union to demonstrate that the unit petitioned for was appropriate. The employer has at all times taken the basic position that the unit was too limited in composition
 
 
 [10]
 Forty-one of the employees excluded from the service and maintenance unit are technical employees. Thirty-two of the forty-one are licensed practical nurses (LPNs). The Acting Regional Director classified receptionists (with one exception), clerks (warehouse store, shipping/receiving, inventory control), and the purchasing secretary to be within the service and maintenance unit. He excluded the printer, barber, and beauticians, but the Board modified the unit by permitting them to vote subject to challenge. He excluded also the camp caretaker, housekeeper, and maintenance worker
 
 
 [11]
 A "health care institution" includes "any hospital, convalescent hospital, health maintenance organization, health clinic, nursing home, extended care facility, or other institution devoted to the care of sick, infirm, or aged." 29 U.S.C. Sec. 152(14)
 
 
 [12]
 Section 4 of Sen. Taft's bill would have precluded the Board from finding one of these four units appropriate unless it included all employees within the classification. S.2292, 93d Cong., 1st Sess. (1973), reprinted in Sen. Subcomm. on Labor, Comm. on Labor & Public Welfare, 93d Cong., 2d Sess., Legislative History of the Coverage of Nonprofit Hospitals Under the National Labor Relations Act, 1974, Public Law 93-360 (S.3203), at 449, 457-58 (1974) [hereinafter cited as Legis.Hist.]. The commentators and courts generally overlook the fact that under the bill, units other than the four could be agreed to by the employer and labor organizations. Id. at 458
 
 
 [13]
 Senate and House Reports contained identical language under the heading "Effect on Existing Law." The passage in full states:
 Due consideration should be given by the Board to preventing proliferation of bargaining units in the health care industry. In this connection, the Committee notes with approval the recent Board decisions in Four Seasons Nursing Center, 208 NLRB No. 50, 85 LRRM 1093 (1974) and Woodland Park Hospital, 205 NLRB No. 144, 84 LRRM 1075 (1973), as well as the trend towards broader units enunciated in Extendicare of West Virginia, 203 NLRB No. 170, 83 LRRM 1242 (1973).[1]
 
 
 [1]
 By our reference to Extendicare, we do not necessarily approve all of the holdings of that decision.
 S.Rep. No. 766, 93d Cong., 2d Sess. 5 (1974), reprinted in 1974 U.S.Code Cong. & Ad.News 3946, 3950, and in Legis.Hist. at 8; H.R.Rep. No. 1051, 93d Cong., 2d Sess. 7 (1974), reprinted in Legis.Hist. at 269. See generally J. Abodeely, R. Hammer, & A. Sandler, The NLRB and the Appropriate Bargaining Unit 241-290 (rev. ed. 1981); Bumpass, Appropriate Bargaining Units in Health Care Institutions: An Analysis of Congressional Intent and its Implementation by the National Labor Relations Board, 20 B.C.L.Rev. 867 (1979).
 
 
 [14]
 There was, however, apparently testimony that wages increased at a far lower rate than overall costs. 120 Cong.Rec. 12937 (1974), Legis.Hist. at 93 (remarks of Sen. Cranston citing hearing testimony of Joseph Murphy, Service Employees International Union Representative). We have found no discussion of the impact on wage costs that one might predict from nonrecognition of multiple units and consolidation of representation in a few inclusive unions
 
 
 [15]
 The Trustees also argue that the Board failed to follow its own precedents, an argument that seems to run counter to its principal argument that the Board's precedents had not themselves followed the congressional admonition and the circuit court decisions. The precedents cited include Mt. Airy Found., 253 NLRB 1003, 1005-06 (1981); Newton-Wellesley Hosp., 250 NLRB 409 (1980); Mon Valley United Health Servs., Inc., 238 NLRB 916, 923-24 (1978); Kaiser Found. Health Plan of Colo., 230 NLRB 438, 439 (1977)
 In Mon Valley the union petitioned for a wall-to-wall unit, excluding physicians and supervisors. Here, the union requested a service and maintenance unit; prior bargaining history indicated that employees were not likely to agree to a wall-to-wall unit. See note 20 infra. Mt. Airy and Kaiser Foundation Health Plan simply stand for the proposition that the Board will not certify units limited to subcategories of professional employees where different types of professionals perform identical functions. These cases do not support the Trustees' argument that similarity of job function among workers from separate categories of professional, technical, and service and maintenance employees require that these categories be placed in a single unit. Finally, Newton-Wellesley Hospital holds that a bargaining unit limited solely to registered nurses is not per se appropriate, but that question is not involved here. We find no inconsistency between the determination made here and the other decisions of the Board; it was therefore not necessary for the Acting Regional Director to set forth the distinctions we have made above, see Memorial Hosp. v. NLRB, 545 F.2d 351, 357-58 (3d Cir.1976), as it would have been a useless exercise, because the precedents are quite inapposite for the propositions the employer would have them stand.
 
 
 [16]
 We note with criticism that the Union, in its appellate brief, states that "[h]ad the Employer [during the representation proceeding] suggested as appropriate a service and maintenance unit with technical employees included, the Union would likely have been amenable to stipulating to such." Br. at 23-24. Although a union is under no obligation to petition to represent the largest conceivably appropriate unit, it is under a good faith obligation to act within the policies of the NLRA as amended by the Health Care Amendments. The brief suggests, however, that the Union's position is after-the-fact of the election; counting the votes, it now believes it would have won even in the larger unit
 
 
 [17]
 In Magnesium Casting Co. v. NLRB, 401 U.S. 137, 91 S.Ct. 599, 27 L.Ed.2d 735 (1971), the Supreme Court observed:
 An employer who contests the election, including the unit determination, can only obtain court review under Sec. 10 after an unfair labor practice charge has been made against him by the Board for refusing to bargain collectively "with the representatives of his employees" as provided in Sec. 8(a)(5).
 In that review, however, the determination of the bargaining unit by the regional director need not be reviewed by the Board. Whether the Board reviews the initial decision on the merits, see Pittsburgh Plate Glass Co. v. N.L.R.B., 313 U.S. 146, 162, 61 S.Ct. 908, 917, 85 L.Ed. 1251, or the employer fails to request review of the action of the regional director, or the Board denies a request for review, the Board has discretion to reopen the issue where newly discovered noncumulative evidence is available.
 ....
 Historically, the representation issue once fully litigated in the representation proceeding could not be relitigated in an unfair labor practice proceeding. We so held in Pittsburgh Plate Glass Co. v. N.L.R.B., supra.
 401 U.S. at 139-40, 141, 91 S.Ct. at 600, 601.
 Thus, the Board's decision in this case is "technically correct" because summary judgment in the unfair labor practice proceeding is appropriate when the unit determination has been fully and fairly litigated in the representation proceeding. The decision is "substantively useless" because recourse to boilerplate tells the parties and the reviewing court precisely nothing about the Board's reasoning that the unit determination effectuates congressional policy.
 We urge the Board to articulate its review of the Regional Director's unit determination. To do so may well hasten bargaining and obviate court review, if the parties find the reasoning compelling and consistent with precedent.
 
 
 [18]
 Fed.R.Evid. 301 provides that "a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of non-persuasion, which remains throughout the trial upon the party on whom it was originally cast." The Tenth Circuit has retreated from reliance on Fed.R.Evid. 301, but not from the proposition that the Board may not apply presumptions in unit determinations. See Presbyterian/St. Luke's Medical Center, 653 F.2d at 456-57, as modified by Beth Israel Hosp. & Geriatric Center, 688 F.2d at 698-700
 
 
 [19]
 The major buildings of the nursing complex are connected by an enclosed breezeway, and the employer provides transportation within the 13-building complex. The Trustees also operate a recreational facility 40 miles from Utica. The Acting Regional Director did not include the Round Lake Camp caretaker, housekeeper, and maintenance worker in the service and maintenance unit. More significant than its distant location, as the NLRB notes, is the finding that the camp
 is not, like the Nursing Home, a health care facility, but is rather, as described by Nursing Home Executive Director Brenzier, a recreational summer camp operated by the Masonic Lodge, enjoyed by "approximately 115 to 125 Masonic youth, children, throughout the whole state" that Nursing Home residents may also visit .... The Camp is open only two months a year ...., and has its own director and 15 seasonal employees that the Nursing Home concedes should not be in the unit .... Indeed, the record reveals that the extent to which the Camp and some of its employees are under Brenzier's authority is an historical accident, owing to the fact that part of the Nursing Home was once an orphanage, and the Camp was acquired "to accommodate those children in the summertime."
 NLRB Br. at 30 n. 31.
 
 
 [20]
 In 1971 and 1972, the Union-intervenor petitioned first the state and then the federal labor relations boards to represent Masonic Home employees; the Union withdrew both petitions prior to an election. In 1976, the National Union of Health Care Workers, District 1199, AFL-CIO, filed a petition. In 1978, Local 182 of the International Brotherhood of Teamsters petitioned, but the employees rejected their representation in a Board-conducted election. In each of these petitions the unit included not only service and maintenance employees, but also technical employees (including LPNs), professional employees (including RNs), and so far as appears, business office clerical employees
 The Trustees' testimony on patterns of representation in similar health care facilities was inconclusive at best. Of some 200 nursing homes not affiliated with hospitals in upstate New York (north and west of Poughkeepsie and Kingston), 17 have labor contracts. The Union represented a unit of service and maintenance, clerical, and LPN technical employees at Bethany House, another facility in the two county area. Summarizing his research, the witness testified: "Some bargaining units of some of the nursing homes include technical with service and maintenance, LPN's or technicals. That's about all I can answer."
 
 
 [21]
 Sen. Williams, speaking to the Conference Report on S.3203, stated:
 [T]he National Labor Relations Board has shown good judgment in establishing appropriate units for the purposes of collective bargaining, particularly in wrestling with units in newly covered industries. While the Board has, as a rule, tended to avoid an unnecessary proliferation of collective bargaining units, sometimes circumstances require that there be a number of bargaining units among nonsupervisory employees, particularly where there is such a history in the area or a notable disparity of interests between employees in different job classifications.
 
 
 [120]
 Cong.Rec. 22575 (1974), Legis.Hist. at 362-63. He also cautioned that the legislation
 is the product of compromise, and the [NLRB] in administering the act should understand specifically that this committee understood the issues confronting it, and went as far as it decided to go and no further and the Labor Board should use extreme caution not to read into this act by implication--or general logical reasoning--something that is not contained in the bill, its report and the explanation thereof.
 Id., Legis.Hist. at 361.